Claude Anders and Joyce Anders, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Wade H. Patrick and Ethel H. Patrick, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 8932–73, 8933–73.    Filed July 11, 1977.

*John Y. Merrell* and *Richard P. Buskell,* for the petitioners.
*Thomas F. Donahue,* for the respondent.

Drennen, *Judge:* In these consolidated cases respondent sought deficiencies in Federal income tax and additions to tax as follows:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax under sec. 6653(a), I.R.C. 1954[1] |
|---|---|---|---|---|
| 8932–73 | Claude Anders and Joyce Anders | 1968 | $13,824.55 | $691.23 |
| 8933–73 | Wade H. Patrick and Ethel H. Patrick | 1968 | 25,427.93 | 1,271.37 |
|  |  | 1969 | 26,822.12 | 1,341.11 |

In docket No. 8933–73, respondent filed an amendment to his answer seeking an increase in the deficiency for 1969 from $21,289.81 to $26,822.12 and an increase in the addition to tax

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.

for 1969 from $1,064.49 to $1,341.11. After certain concessions by the parties, two issues remain to be decided.[2] The primary issue is whether petitioners sold an option to purchase land, resulting in long-term capital gain, or sold part of the land covered by the option, resulting in either short-term capital gain or ordinary income. The second issue is whether petitioners are liable for the 5-percent addition to tax under section 6653(a). The amount of a medical expense deduction depends on the outcome of other issues.

### FINDINGS OF FACT

Certain facts have been stipulated and are found accordingly.

Claude and Joyce Anders are husband and wife who resided in Johnson City, Tenn., at the time their petition was filed. They filed joint Federal income tax returns for calendar year 1968 with the District Director of Internal Revenue for the District of Tennessee.

Wade H. Patrick and Ethel H. Patrick are husband and wife who resided in Johnson City, Tenn., at the time their petition was filed. They filed joint Federal income tax returns for calendar years 1968 and 1969 with the District Director of Internal Revenue for the District of Tennessee.

Joyce Anders and Ethel H. Patrick did not actively participate in the transactions in question, and the designations "petitioners" and "Anders" and "Patrick" will refer to Claude Anders and Wade H. Patrick, respectively.

On October 31, 1963, petitioners acquired an option from H. H. Thomas and his wife on 82.199 acres of land (the Thomas property) in Washington County, Tenn., each taking a one-half interest in the option. Under the option agreement petitioners or "their heirs, assigns, or designees," had the exclusive option to purchase the land on or before October 31, 1968. The option was exercisable only with respect to the entire property, not just a portion thereof. The option price of the property was $110,000 with certain reductions in price if the option were exercised before the fifth year of the option period. As part of the consideration for the option, petitioners

---

[2] In docket No. 8933-73 a computation under Rule 155 will be necessary as a result of the parties' concessions.

were required to pay $200 a month during the option period until the option was exercised. These payments would be applied toward the purchase price if the option were exercised.

On May 14, 1968, petitioners entered into an agreement with R. T. Dennis and R. E. Henry. The agreement, signed by R. T. Dennis, R. E. Henry, Claude Anders, and Wade Patrick, was as follows:

May 14, 1968

We, the undersigned, agree this date to purchase from Claude Anders and Wade Patrick, agents a tract of land immediately adjoining our present property on the South and East consisting of forty (40) acres with access, unencumbered deed, and clear title.

The consideration shall be one hundred & thirty-five ($135,000.00) thousand dollars to be paid $5,000.00 this date, $80,000.00 receipt of deed, and a note for $50,000.00 payable in six (6) months bearing interest at the rate of 6% per annum.

At the time of the agreement, petitioners received a $5,000 check from Dennis and Henry, but they never presented it for payment.

After May 14, 1968, petitioners discussed the entire transaction, including the tax consequences, with their accountant, J. B. Holt. Holt had done accounting work for both petitioners prior to and during 1968 and prepared their tax returns. Holt advised them that they should sell the option and never take possession of the property.

On May 30, 1968, petitioners returned the $5,000 check dated May 14, 1968, to Dennis and Henry.

On May 31, 1968, these transactions occurred:

(1) Anders and Patrick "assigned the option" to J. B. Holt and his wife by the following notation, handwritten on the original option agreement.

May 31, 1968

For and in consideration of $1.00 and other considerations we hereby assign the within option to J. B. Holt and wife Thelma F. Holt.

WADE H. PATRICK
CLAUDE ANDERS
by Claude Anders

The total amount to be paid for the option was $218,000.

(2) The Holts, acting in their own behalf, exercised the option to purchase the Thomas property and received a

warranty deed conveying to them the property covered by the option. Against the $110,000 purchase price, the Holts were credited with the $11,000 in monthly option payments paid by petitioners, leaving a balance of $99,000. The cost to the Holts consisted of the following:

| | |
|---|---|
| Check of J. B. Holt dated May 31, 1968 | $21,000 |
| Promissory note due Jan. 1, 1969 | 40,000 |
| Promissory note due May 31, 1971 | 38,000 |
| | 99,000 |

The Holts executed a deed of trust covering the Thomas property in favor of the Thomases to secure the $78,000 indebtedness. Forty acres of the property, as requested by J. B. Holt, were to be released from the lien of the deed of trust upon payment of the $40,000 note.

(3) The Holts executed a deed to Dennis and Henry conveying the 40-acre tract that was the subject of the May 14, 1968, agreement to which Dennis, Henry, Anders, and Patrick had been parties. The consideration for this tract was:

| | |
|---|---|
| Check dated June 4, 1968 | $85,000 |
| Assumption of the $40,000 promissory note due by the Holts on Jan. 1, 1969 | 40,000 |
| Promissory note of Dennis and Henry payable to the Holts on Jan. 1, 1969 | 10,000 |
| | 135,000 |

(4) J. B. Holt made separate checks dated May 30, 1968, payable to Claude Anders and Wade H. Patrick in the identical amount of $25,500; transferred to Anders and Patrick the $10,000 note dated May 31, 1968, the Holts received from Dennis and Henry; and executed and delivered to Anders and Patrick a $157,000 nonrecourse, non-interest-bearing note dated May 31, 1968, payable on demand. The $157,000 note was secured by a second deed of trust on the 42.199 acres remaining after sale of the 40-acre tract to Dennis and Henry. These items constituted the $218,000 purchase price for the option.

The $85,000 cash received by the Holts from Dennis and Henry was used as follows:

| | |
|---|---:|
| To the Thomases for the Thomas property | $21,000 |
| To Anders and Patrick for the option | 51,000 |
| For legal, planning, and zoning costs | 8,000 |
| Subtotal | 80,000 |
| Retained by J. B. Holt | 5,000 |
| Total | $85,000 |

Petitioners reported gain on the sale of the option in their respective Federal income tax returns for 1968 as long-term capital gain.

On December 9, 1968, Smith Artz, Inc., the real estate brokerage firm that handled most of the Holts' sales of the Thomas property, purchased from the Thomases the $38,000 Holt note to the Thomases.

On December 10, 1968, petitioners borrowed $30,000 from Smith Artz, Inc., for which they executed a note and put up Holt's $157,000 note as security. The loan proceeds were used to improve the remaining Thomas property held by the Holts. No evidence of indebtedness was executed between petitioners and the Holts for this amount, and the Holts did not receive any of the loan proceeds; the lender paid the moneys out directly to the workers for the improvements. The loan was repaid out of proceeds of subsequent sales of the Thomas property.

On June 19, 1969, the Holts entered into a contract for the sale of a 10.83-acre parcel of the Thomas property to Coca-Cola Bottling Works of Tennessee. On December 4, 1969, this sale was closed for a cash consideration of $77,500. The sale proceeds were distributed as follows:

| | |
|---|---:|
| For construction costs, taxes, interest, and real estate commission | $47,438.03 |
| To Smith Artz, Inc., on $30,000 Anders-Patrick note | 20,000.00 |
| To Anders and Patrick on $157,000 Holt note | 5,661.97 |
| Subtotal | 73,100.00 |
| Retained by J. B. Holt | 4,400.00 |
| Total | 77,500.00 |

On August 20, 1970, the Holts sold certain sewer tap rights, which they had received from Johnson City in exchange for an easement, for a cash consideration of $4,950. These funds were disbursed by the Holts as follows:

| | |
|---|---|
| To Anders and Patrick.................................................... | $4,800 |
| Retained by J. B. Holt................................................. | 150 |
| Total.......................................................... | 4,950 |

On May 24, 1972, J. B. Holt entered into a contract for the sale of a tract of the Thomas property to Davis Lafitte. This transaction was consummated and on November 15, 1972, the Holts executed a deed that conveyed the property to the Southland Corp., as directed by Lafitte, for a cash consideration of $28,000. The net sale proceeds, after reductions for commission, legal fee, and taxes amounted to $18,871.27. This amount was deposited in the account of Memorial Parking, Inc., a parking lot business equally owned and jointly operated by petitioners. The corporation had only a few banking transactions a month. Following are disbursements relating to this sale made from the account:

| | |
|---|---|
| To Smith Artz for legal expense ............................................. | $40.00 |
| To W. P. Artz for interest............................................. | 5,836.49 |
| To Smith Artz for interest........................................... | 2,257.20 |
| To W. P. Artz on $38,000 Holt note to Thomases.................. | 500.00 |
| To Anders and Patrick on $157,000 note ................................ | 500.00 |
| To Anders and Patrick.................................................... | 8,237.52 |
| To J. B. Holt and E. E. Christian for Holt, and to Holt ....... | 1,500.00 |
| | 18,871.21 |

Patrick helped negotiate the Southland sale. The Southland real estate agent from Kingsport, Tenn., had secured a cobroker in Johnson City. The Johnson City agent talked to J. B. Holt about the parcel, but he could not show her the property at that time and he asked her to get hold of Patrick. She did; Patrick showed both real estate agents the property and negotiated with them. At some time Patrick explained to the Johnson City agent that he (Patrick) was not the owner of the property, but the Kingsport agent got the impression from the Johnson City agent that Patrick owned the property. As a result of this impression, a check for $100 and an initial contract were drawn as if Patrick were the owner. After the Kingsport agent was advised that the Holts owned the property, however, all documents were handled on the basis of the Holts' ownership. Patrick also delivered the deed from the Holts to Southland.

In connection with the Southland property, Patrick also went with Holt to apply to the City to rezone the property,

and after the sale helped Southland make arrangements for filling a portion of its property and for installing a storm drain.

On May 18, 1973, the Holts executed a deed that conveyed a 1.72-acre tract of the Thomas property to Curtis McLane and W. E. Smedley for a cash consideration of $43,000. The computation of net proceeds follows:

| | | |
|---|---:|---:|
| Selling price | | $43,000.00 |
| Less: Deductions by agent | | |
| For real estate commission and legal expense | $4,343.00 | |
| To Artz on $30,000 Anders-Patrick note to Smith Artz, Inc. | 8,500.00 | |
| To Artz on Holt $38,000 note | 9,500.00 | |
| To Artz for interest | 1,159.25 | 23,502.25 |
| Net proceeds | | 19,497.75 |

The net proceeds were deposited in the Memorial Parking, Inc., account and disbursed as follows:

| | |
|---|---:|
| For survey | $150.00 |
| To Anders and Patrick | 17,497.75 |
| To J. B. Holt | 2,900.00 |
| Total | 20,547.75 |

On March 7, 1974, the District Director of Internal Revenue, Nashville, Tenn., seized the Thomas property and served notice of seizure on the Holts.

On March 15, 1974, Anders and Patrick executed a $12,500 promissory note in favor of Smith Artz, Inc. This note was secured by the $157,000 note executed by the Holts to Anders and Patrick. The proceeds of this $12,500 note were loaned by Anders and Patrick to the Holts to pay the Internal Revenue Service lien on the Thomas property. The loan was repaid from proceeds of a May 1, 1974, sale of a parcel of the Thomas property.

On May 1, 1974, the Holts executed a deed that conveyed a 1.85-acre tract of the Thomas property to Curtis McLane and William E. Smedley for $35,250, payable $10,000 in cash and a promissory note for $25,250. Computation of the net sale proceeds follows:

| | |
|---|---:|
| Cash payments | $35,250.00 |
| Interest payments | 1,389.11 |

| | | |
|---|---|---|
| Subtotal | | 36,639.11 |
| Less: | | |
| Expenses of sale | $8,561.52 | |
| Judgment against Holt | 903.04 | 9,464.56 |
| Net proceeds | | 27,174.55 |

Disbursements of the net proceeds were as follows:

| | |
|---|---|
| For legal expense | $8.00 |
| To Smith Artz on Anders-Patrick $12,500 note | 12,500.00 |
| To Smith Artz on Holt $38,000 note | 8,540.48 |
| To Smith Artz for interest | 1,848.63 |
| To Anders and Patrick | 4,285.44 |
| | 27,182.55 |

On July 26, 1974, the Holts executed a deed that conveyed a 2.9-acre tract of the Thomas property to Charles C. Swatzell for $33,000. Computation of the net sale proceeds follows:

| | | |
|---|---|---|
| Selling price | | $33,000.00 |
| Less: Deductions by agent | | |
| For expenses of sale and taxes | $7,884.29 | |
| To Artz on $38,000 Holt note | 6,500.00 | |
| To Artz for interest expense | 145.00 | |
| To Anders and Patrick on $157,000 Holt note | 3,053.57 | 17,582.86 |
| Net proceeds | | 15,417.14 |

The net proceeds were deposited in the Memorial Parking, Inc., account and disbursed as follows:

| | |
|---|---|
| For survey and cleanup | $1,150 |
| To Anders and Patrick | 12,000 |
| To J. B. Holt | 850 |
| | 14,000 |

On January 8, 1976, the Holts executed a deed that conveyed a 3.4-acre tract of the Thomas property to C. C. Swatzell for $20,000. After reductions for taxes, interest, legal expense, and real estate commission, the net sales proceeds amounted to $13,885.45. These proceeds were deposited in the Memorial Parking, Inc., account and disbursed as follows:

| | |
|---|---|
| For taxes and survey | $1,104.97 |
| To Smith Artz on $38,000 Holt note | 2,966.79 |

To Smith Artz for interest................................................................ 1,139.00
To Anders and Patrick................................................................. 8,000.00
13,210.76

In summary, from May 31, 1968, to the date of trial, the Holts sold 7 tracts of the Thomas property. All the contracts of sale, deeds, and related documents were executed by the Holts as owners, and the deeds were recorded in Washington County, Tenn., as valid documents conveying the parcels of real estate from the Holts to the respective purchasers. The date of sale, purchaser, and purchase price of these sales were as follows:

| Date | Purchaser | Price |
|---|---|---|
| May 31, 1968 | Dennis & Henry | $135,000 |
| Dec. 4, 1969 | Coca-Cola Bottling Works | 77,500 |
| Nov. 15, 1972 | The Southland Corp | 28,000 |
| May 18, 1973 | McLane & Smedley | 43,000 |
| May 1, 1974 | McLane & Smedley | 35,250 |
| July 26, 1974 | Charles C. Swatzell | 33,000 |
| Jan. 8, 1974 | C. C. Swatzell | 20,000 |
| Total selling price | | 371,750 |

In addition, the Holts sold sewer tap rights in 1970 for $4,950. They reported the gain on each sale of a tract of the Thomas property as ordinary income in their joint Federal income tax returns for the years in which the sales were made. Their 1968 and 1969 returns were examined and their 1970 and 1971 returns were under examination at the time of trial. No adjustments were proposed for 1968 and 1969, and no adjustments had been proposed for 1970 and 1971 with reference to the Holts' treatment of the sales from the Thomas property.

Payments made by the Holts on the $38,000 note of May 31, 1968, that Smith Artz purchased from the Thomases and balance due at the time of trial were as follows:

| | Debit | Credit | Balance |
|---|---|---|---|
| 5/30/68 note to H. H. Thomas purchased by Artz | | $38,000 | ($38,000.00) |
| 11/15/72 from proceeds of Southland sale | 500.00 | | (37,500.00) |
| 5/22/73 from proceeds of Smedley #1 sale | 8,500.00 | | (29,000.00) |
| 8/1/74 from proceeds of Swatzell #1 sale | 6,500.00 | | (22,500.00) |
| 1/18/75 from proceeds of Smedley note | 2,500.00 | | (20,000.00) |

| | | |
|---|---|---|
| 5/15/75 from proceeds of Smedley note.................................... 6,040.48 | | (13,959.52) |

Payments made by the Holts on the $157,000 nonrecourse note of May 31, 1968, to Anders and Patrick and balance due at the time of trial were as follows:

| | Credit | Debit | Balance |
|---|---|---|---|
| Note dated 5/31/68 purchase of option ............................... | | $157,000 | ($157,000.00) |
| 12/4/69 from proceeds of Coca-Cola sale .................................. | 5,661.97 | | (151,338.03) |
| 8/20/70 from proceeds of sewer easement ............................... | 4,800.00 | | (146,538.03) |
| 11/15/72 from proceeds of Southland sale ................................. | 8,237.52 | | (138,300.51) |
| 5/22/73 from proceeds of Smedley #1 sale ............................. | 17,497.75 | | (120,802.76) |
| 5/6/74 from proceeds of Smedley #2 sale ............................. | 4,285.44 | | (116,517.32) |
| 8/1/74 from proceeds of Swatzell #1 sale ............................. | 15,053.57 | | (101,463.75) |
| 1/27/76 from proceeds of Swatzell #2 sale ............................. | 12,310.76 | | (89,152.99) |

At the time of trial, the Holts had retained $29,003.04 for their direct benefit from the sales relating to the Thomas property, after expenses of sale, costs related to the property (including improvements), and debt service. The amounts were as follows:

| | |
|---|---|
| Dennis & Henry 5/31/68............................................ | $5,000.00 |
| Coca-Cola 12/4/69 .................................................. | 4,400.00 |
| U.G. Trivett and/or Trend Builders 8/20/70 ........................ | 150.00 |
| Southland 11/15/72 ................................................ | 1,500.00 |
| Smedley #1    5/18/73............................................. | 2,900.00 |
| Smedley #2    5/1/74............................................. | [1]13,403.04 |
| Swatzell #1    7/26/74............................................. | 850.00 |
| Swatzell #2    1/18/76............................................. | 800.00 |
| Total................................................................... | $29,003.04 |

[1] Note repaid and payment for judgment against Holt.

The Holts also were the record owners of the four parcels of the Thomas property that remained unsold. The prices the Holts were asking for these parcels follow:

| | |
|---|---|
| 2.57-acre tract adjacent to Southland property...................... | $35,000 |
| 2.68-acre tract adjacent to Smedley property......................... | 75,000 |

| | |
|---|---|
| 10.1-acre tract adjacent to Swatzell property | 100,000 |
| 4.5-acre tract adjacent to Coca-Cola property | 100,000 |

In their respective tax returns for the year 1968, Anders and Patrick reported the gain on the sale of the Thomas option as long-term capital gain on the installment basis. In the notices of deficiency respondent determined that Anders and Patrick realized a short-term capital gain from the sale of land to Dennis and Henry in 1968. By amended answer respondent asserts that Patrick realized a gain of $18,546.49 on his one-half share of the proceeds of the sale to Coca-Cola in 1969, but did not state whether this gain should be taxable as long-term capital gain, short-term capital gain, or ordinary income. In light of our conclusion on the first issue the latter question becomes moot.[3]

### ULTIMATE FINDINGS OF FACT

Anders and Patrick sold their option on the Thomas property to the Holts in a bona fide and arm's-length transaction.

J.B. Holt and his wife bought the option, exercised it, and have sold off parts of the Thomas property, all for their own account.

### OPINION

The main issue is whether the form of petitioners' transaction reflects its substance and thus, despite the deliberate choice of a low-tax route, it should be given full effect. In form petitioners sold an option on the Thomas property to their accountant and his wife in 1968. Petitioners reported the transaction in their 1968 Federal income tax returns as long-term capital gain, and that is their position in this litigation. Section 1234 provides a special rule for options: Gain attributable to an option to buy property is considered gain from the sale of property that has the same character as the property to which the option relates in the taxpayer's

---

[3] On brief respondent makes the broad assertion that Anders and Patrick are still the beneficial owners of the Thomas property and that gain on the sale of any of that land is taxable to petitioners. Since the Anders' taxable year 1969 was not involved in the notice of deficiency issued to them, respondent's claim with respect to the sale to Coca-Cola in 1969 is not in issue in docket No. 8932-73.

hands (or would have in his hands if acquired by him). Pursuant to this provision, petitioners argue they sold an option to the Holts, and since the land was a capital asset and they held the option for some 4½ years, they derived a long-term capital gain.[4]

Respondent in his notices of deficiency, however, disregarded the sale of the option. He instead imputed to petitioners the sale to Dennis and Henry in 1968, resulting in short-term capital gain. In his amended answer, respondent also seeks to impute to Patrick a one-half share of the sale to the Coca-Cola Bottling Works in 1969. Respondent contends, as we understand his argument, that Holt was merely the petitioners' agent in exercising the option and in the subsequent sales of the Thomas property parcels. According to respondent, the Holts never acquired a beneficial interest in the Thomas property. Respondent also seeks an addition to tax under section 6653(a), claiming there was an underpayment of tax due to negligence or intentional disregard of rules and regulations.

Apart from the section 6653(a) question, respondent makes two specific arguments. His first argument is devoted to the effect of events before the May 31, 1968, sale of the option by petitioners to Holt. On May 14, 1968, some 6 months before their option would expire on the Thomas property, petitioners entered into an agreement with Dennis and Henry relating to a 40-acre parcel of the Thomas property. Under the agreement Dennis and Henry agreed "to purchase from Claude Anders and Wade Patrick, agents." The "consideration," according to the agreement, was $135,000 to be paid $5,000 on the date of the agreement, $80,000 on receipt of deed, and a note for $50,000 payable in 6 months bearing interest at the rate of 6 percent per annum. Petitioners received a $5,000 check in accordance with the agreement. After May 14, 1968, however, petitioners discussed the entire transaction, including the tax consequences, with their accountant, J. B. Holt. And, on May 30, 1968, petitioners returned the $5,000 check to Dennis and Henry.

---

[4] Under sec. 1222(3) a long-term capital gain for the years in issue meant gain from (1) the sale or exchange of (2) a capital asset (3) held for more than 6 months.

From these events, respondent contends: The Dennis and Henry sale was completed prior to the sale of the option; *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), mandates that the substance of the transaction be determinative regardless of the form the transaction assumes; petitioners exercised their option on the Thomas property through J. B. Holt; and they used Holt to sell the 40-acre tract to Dennis and Henry. (Respondent's brief contains no specific arguments with respect to the 1969 Coca-Cola sale.)

We believe respondent reads too much into these events and cites *Commissioner v. Court Holding Co., supra,* for more than what it stands for. We agree that the May 14, 1968, "agreement" was more than a mere offer to purchase used to establish a value for the option, as petitioners contend. But even if the agreement were legally enforceable against petitioners, it did not complete the sale to Dennis and Henry. Whatever effect the May 14, 1968, agreement had between petitioners and Dennis and Henry, only the Thomases, as owners of the entire 82.199-acre property, could sell a portion of it to Dennis and Henry. That petitioners did not own the land distinguishes this case from *Commissioner v. Court Holding Co., supra.* In that case the taxpayer-corporation, while it still had legal title to the property, concluded negotiations for its sale, and an oral agreement was reached. When the parties met to reduce the agreement to writing, the buyer was told the sale could not be consummated because of the large corporate tax on the selling corporation. The next day the taxpayer liquidated. The shareholders were deeded the building, and they attempted to complete the sale. One thousand dollars already paid to the corporation was applied as part payment of the purchase price. The Supreme Court, reversing the Court of Appeals for the Fifth Circuit, upheld this Court's findings that the corporation had not abandoned the sale, and imputed the gain to the corporation. Since petitioners here did not own the land discussed in the May 14, 1968, agreement, they could not complete the sale of 40 acres without exercising the option to purchase the entire Thomas property. Indeed, respondent is inconsistent in arguing the sale was completed before the option was transferred, and at the same time contending petitioners exercised their option through J. B. Holt, and "then used [Holt] to sell" the 40-acre

tract to Dennis and Henry. And, if respondent relies on *Commissioner v. Court Holding Co.*, *supra*, to say the deliberate choice of selling the option at a low tax rate cannot be given full effect, his reliance is misplaced. See, e.g., *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950), in which the Court upheld the Court of Claims finding that a genuine sale of assets by the shareholders had been effected, after the buyer refused to buy the stock and the shareholders offered to liquidate the corporation and sell the assets; the corporation could liquidate even though a primary motive was to avoid corporate taxation.

The following cases also are cited by respondent, without discussion of their facts, for the proposition that a taxpayer cannot negotiate an agreement with an ultimate buyer for the sale of land subject to an option he holds and thereafter transfer the option to a third party to carry out the terms of the arrangement, without being deemed the seller of the land: *Butler v. Commissioner*, 43 B.T.A. 1005 (1941); *Barber v. United States*, 215 F.2d 663 (8th Cir. 1954); *Blick v. Commissioner*, 31 T.C. 611 (1958), affd. 271 F.2d 928 (3d Cir. 1959); *Miller v. Commissioner*, T.C. Memo. 1960–92. In those cases the holder of an option entered into a contract to sell all the property subject to the option, and the contract was performed according to its terms. However, at closing the taxpayer caused the original owner of the underlying property to transfer it directly to third-party purchasers, and argued that because he never took title to the property, it was the option rather than the underlying property that was the subject of the sale. Based on the agreement and supporting facts, the court in each case held a sale of the underlying property was made.

If there is a common theme running through the cited cases, it is that an option holder can be considered to have exercised an option even though he never acquires legal title to the underlying property. In the cited cases the optioned property was deeded directly from the original owners to the ultimate purchaser, and running title through the option holder would have been a needless step. Whether petitioners sold an option, however, is a question of fact, and the cited cases are not sufficiently similar to be of much guidance. To begin with, in the cited cases the agreement to sell covered all

the property subject to the option. But the May 14, 1968, agreement here involved dealt with just a part of the Thomas property, and the option was exercisable only with respect to the entire property. More importantly, the cited cases concerned only the original owner of the property (here the Thomases), the taxpayer-option holder (here petitioners), and the purchaser of the underlying property (here Dennis and Henry and others). If it were not for the Holts, the cited cases would be more directly on point. But here the Holts were interposed between the holders of the option and the purchasers of the property. We believe the events before the May 31, 1968, sale of the option did not prevent petitioners from selling the option and the cited cases are inapposite, provided the Holts acted in their own interest in exercising the option and in selling the parcels of the Thomas property.

Respondent's second argument deals with the May 31, 1968, sale of the option to the Holts and subsequent events. He contends the transfer of the option lacked substance. In actuality, according to respondent, petitioners, not the Holts, controlled disposition of all the Thomas parcels; Holt acted as an agent for subsequent sales, and at no time did the Holts possess beneficial ownership of any of the Thomas property held in their name.

In support of his position, respondent relies on petitioners' "involvement" in the subsequent transactions concerning the Thomas property. First, respondent cites the $30,000 loan obtained by petitioners on December 10, 1968, to improve the property. No evidence of indebtedness was executed between petitioners and the Holts, and the Holts did not receive any of the loan proceeds; the lender paid the moneys out directly to the workers for the improvements. The loan was repaid out of proceeds of subsequent sales from the Thomas property. Thus, argues respondent, the Holts were not the borrowers of the funds, and use of the sale proceeds to pay a debt of petitioners shows petitioners were the actual owners of the Thomas property.

Respondent also is bothered by petitioners' "involvement" in a subsequent sale of a parcel of the Thomas property. In connection with the 1972 sale to Southland Corp., a real estate agent from Kingsport, Tenn., negotiated with Patrick and got the impression Patrick was the owner of the property.

After the initial contact, the real estate agent was advised that the Holts owned the property and documents relating to this transaction were handled on the basis of ownership of the parcel being in the Holts. Still, argues respondent, Patrick personally handed the deed to the Southland agent during closing; Holt did not. After the sale, Patrick personally made arrangements for filling a portion of the property sold to Southland and for the installation of a storm drain; Holt did not. And, Patrick had gone with Holt to apply for the necessary zoning changes for that parcel. These facts, according to respondent, establish petitioners' direct interest in and control over sales and sales proceeds connected with the Thomas property.

Another point relied upon by respondent is the use of the bank account of Memorial Parking, Inc., in connection with the sales. Memorial Parking, Inc., owned equally by petitioners, operated a parking lot. As such, it had only a few banking transactions a month. For the November 15, 1972, Southland sale, the May 18, 1973, McLane and Smedley sale, and the July 26, 1974, and January 8, 1976, Swatzell sales, the net sale proceeds were deposited in and distributed from the Memorial Parking account. In total, $67,671.55 was deposited, of which $50,046.04 was disbursed to or for petitioners and $6,050 to Holt. Respondent contends petitioners' control over these net proceeds indicates they were the real owners of the land.

Petitioners contend these actions were perfectly normal in view of the interest of the Holts as owners of the property and Artz and petitioners as mortgagees with respect to the property. That is, it was necessary to consider the security interests, because when a sale was being negotiated Holt would have to get Artz and Anders and Patrick to release their deeds of trust. Petitioners therefore explain the $30,000 loan as follows: In the fall of 1968 it became apparent that to sell the land certain basic improvements such as water, sewer, and streets would have to be made. The Holts' personal resources were not adequate for this purpose, and if the Holts were unable to make these improvements, they would probably default on their debt so petitioners helped the Holts raise the funds. Any improvements to the property would increase its value and strengthen petitioners' security.

Petitioners dismiss Patrick's role in the Southland sale in that it is not unusual for real estate transactions to be negotiated without clear identity of the owners of the property or the purchasers thereof. Indeed, they point out, in the Southland sale itself, the contract of sale listed Davis Lafitte as the purchaser when in fact the purchaser turned out to be the Southland Corp.

Use of the Memorial parking account, according to petitioners, was merely a convenient vehicle for handling the Southland transaction since the Holts were leaving town at the time the transaction was to be consummated. For convenience, they say, it was also used in subsequent transactions.

Whether the form of petitioners' sale of the option to the Holts, the Holts' exercise of the option, and the subsequent sales by the Holts to Dennis and Henry in 1968 and to Coca-Cola Bottling Works in 1969 is to be given full effect does not turn on whether petitioners had some "involvement" in these transactions. We question whether (1) not obtaining an evidence of indebtedness from Holt after the $30,000 Anders-Patrick loan from Artz was used for improvements and (2) the use of the Memorial Parking lot account to disburse net sales proceeds were "perfectly normal" actions of creditors. Still, we agree with petitioners that their involvement in these events was in keeping with their role as creditors with security interests in the Holts' property. In the end the $30,000 loan was used for improvements on the property and repaid out of sale proceeds from the property so that petitioners and the Holts shared the benefits and burdens of the loan. Similarly, the disbursements from the Memorial Parking account were in accord with petitioners' and the Holts' interests. Given their mutual interests in the Thomas property and their close business relationship, petitioners and Holts' activities here are understandable. A final point on Patrick's role in the Southland sale: We are convinced from the record that Patrick, if anything, was the Holts' agent in the sale; Patrick never held himself out as owning the property and once the real estate agent learned that the Holts owned the property the documents relating to the transaction reflected the Holts' ownership.

We find that the form of these transactions, though designed to achieve favorable tax results, reflects their substance. The Thomases recognized the Holts as transferees of the option and deeded the property to them, apparently retaining no commitments from Anders and Patrick. All subsequent contracts of sale, deeds, and related documents were exercised in the Holts' names as owners. The deeds were recorded as valid documents conveying the respective parcels of real estate from the Holts to the respective purchasers. We do not know how long respondent believes the arrangement he suggests could continue, but if such an arrangement were fact, it would cast a cloud on the titles of the present owners of the entire Thomas tract. We cannot believe that the Holts would assume all the obligations involved and pay taxes on the gains unless they anticipated considerable gain for themselves by the time the entire tract is sold. Nor do we believe Anders and Patrick would have risked invalidating all these sales and the security for their investment by retaining beneficial ownership of the property.

Perhaps the most telling point, however, in determining that the transactions had substance is that, as a result of the interests they took in the Thomas property, the Holts stood to make significant gains. After payments on the notes, interest, and other costs, the Holts have retained for their direct benefit $29,003.04 from the proceeds of the sales of tracts from the Thomas property. Moreover, as record owners of the four parcels that remain unsold, they should, as J. B. Holt's uncontroverted testimony indicates, realize a substantial profit. If the tracts are worth their $310,000 asking price, the Holts' equity in the remaining parcels, after reduction for the first mortgage note balance of $13,959.52 and the second mortgage note balance of $89,152.91, is some $206,887.57. Thus, if the asking prices are a reasonable estimate of the value of the remaining parcels, the Holts will have done well in looking out for their own interests. The prices the Holts were asking for the parcels in 1976 are as follows:

| | |
|---|---|
| For 2.57 acres adjacent to .647 acres sold to Southland Corp. in 1972 for $28,000 | $35,000 |
| For 2.68 acres adjacent to 1.85 acres sold to McLane and Smedley in 1974 for $35,250 | 75,000 |
| For 10.1 acres, adjacent to 3.4 acres sold to Swatzell in 1976 for $20,000 | 100,000 |

| | |
|---|---:|
| For 4.5 acres, adjacent to 10.83 acres sold to Coca-Cola Bottling Works in 1969 for | 100,000 |
| Total asking price for 19.85 acres | 310,000 |

Respondent offered no evidence of fair market value to the contrary and even allowing for some give in the asking prices, the Holts should profit nicely from their transactions.

We recognize respondent's contention that as of May 31, 1968, the Holts had incurred some $317,000 in costs ($218,000 for the option and $99,000 in exercising it), and that their opportunity for gain was speculative. Petitioners' $157,000 nonrecourse loan also warrants close scrutiny to determine whether it actually represented merely a creditor's interest in the Thomas property. The opportunity for gain and the size of the secured loan, however, are supported by the value of the Thomas property. Respondent points to the $135,000 sale on May 31, 1968, for about one-half of the land (40 out of 82.199 acres), says the entire Thomas property had a value of $270,000, and concludes the Holts unrealistically paid $317,000 for property worth about $270,000. About a year later, though, 10.83 acres were sold for $77,500. Following respondent's reasoning, this represented about one-fourth of the remaining property. The remaining 41 plus acres therefore would be worth four times $77,500 or $310,000, less the improvements since May 31, 1968, of some $36,000, for a net value of $274,000. On this basis, within a year of the sale of the option, the entire Thomas property would have been worth some $486,500 ($135,000 for the first parcel sold, $77,500 for the second parcel sold, and $274,000 net value for the remaining property). In any event, the Holts now stand to make a sizable gain. Although such a gain may not have been clear in 1968, the gain is a result of the legal relationships established at that time.

In conclusion, we find that petitioners actually sold an option on the Thomas property to the Holts and their reporting of the transaction as long-term capital gain was proper.

The final issue is whether petitioners are liable for the 5-percent addition to tax under section 6653(a). Under that provision the addition to tax is imposed if any part of any underpayment of any income tax is due to negligence or intentional disregard of rules and regulations. Since we have

determined that petitioners properly reported the sale of the option as long-term capital gain, there is no negligence or intentional disregard with respect to that issue. Hence, the addition to tax is not applicable to the Anders in docket No. 8932–73.

For docket No. 8933–73, however, respondent on brief contends the addition to tax is invoked because of an item of "Additional Gross Income" for 1968 and 1969 set out in the notice of deficiency that was conceded by Wade H. Patrick and Ethel H. Patrick in the stipulation of facts. The amounts involved are not minor: $23,862.50 in 1968 and $15,178.60 in 1969. We cannot determine from the notice of deficiency, the pleadings, or anything said at the trial what comprised this concededly unreported gross income. Petitioners argue on brief that respondent apparently asserted the negligence penalty because the real estate transaction was erroneously reported. However, the notice of deficiency does not limit the determination of "negligence or intentional disregard of rules and regulations" to the reporting of the real estate transaction alone; it determined that "part of the underpayment of tax" was due to negligence or intentional disregard of rules and regulations, and respondent argues on brief that the concessions of these amounts of unreported income alone, without explanation, support the negligence penalty against the Patricks. While we are under the impression that assertion of the negligence penalty was based primarily on respondent's determination that the real estate transaction was a deliberate sham, we cannot ignore the fact that the Patricks admittedly failed to report rather large amounts of income in each year. Since the Patricks have the burden of proving error in respondent's imposition of the negligence penalty, and they have offered no proof with respect thereto, we must sustain the imposition of the addition to tax against

494

the Patricks in docket No. 8933–73 for both the years 1968 and 1969. *Estate of Mason v. Commissioner,* 64 T.C. 651 (1975).

> *Decision will be entered for the petitioners in docket No. 8932–73.*

> *Decision will be entered under Rule 155 in docket No. 8933–73.*

---

[1] Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.