ABDUL JALIL AL-HAKIM, ET AL., [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Al-Hakim v. Commissioner
Docket No. 22680-81, 8173-83, 34225-83.
United States Tax Court
T.C. Memo 1987-136; 1987 Tax Ct. Memo LEXIS 136; 53 T.C.M. (CCH) 352; T.C.M. (RIA) 87136; March 16, 1987. Frederick John James, for the petitioners. Neal o. Abreu, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, respondent determined deficiencies and additions *138 to tax in petitioners' Federal income tax as follows: Additions to Tax
Petitioner
Year
Deficiencies
Sec. 6653(b) [2]
Sec. 6653(a)
al-Hakim
1977
$6,274.00
$3,137.00
al-Hakim
1978
45,583.00
$2,279.00
The Genius of
Randy Wallace, Inc.
Ended 4/30/79
14,887.00
744.00
In an amended answer, respondent conceded the fraud addition for petitioner al-Hakim's 1977 taxable year and asserted in lieu thereof the additions to tax pursuant to section 6653(a) and section 6651(a)(1). In another amended answer, respondent asserted the addition to tax pursuant to section 6651(a)(1) for petitioner al-Hakim's 1978 taxable year. [3]
After concessions, the issues for decision are: (1) whether al-Hakim's fee from Alvin Moore was $10,700 or $10,000; (2) whether fees from Alvin Moore and Cleopherus Smith should have been reported on al-Hakim's 1977 Federal individual *139 income tax return instead of his 1978 return; (3) whether al-Hakim should have reported a $112,500 fee from Lyman Bostock; 4) whether al-Hakim should have reported miscellaneous receipts of money; 5) whether the Genius of Randy Wallace, Inc. (Genius, Inc.), is entitled to a new jobs credit; 6) whether the section 6653(a) additions to tax apply to al-Hakim and Genius, Inc., for each of the years at issue; and 7) whether the section 6651(a)(1) additions to tax apply to al-Hakim for the taxable years 1977 and 1978. For convenience, we have combined our findings of fact and opinion by issues. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated by this reference. Income From Alvin Moore and Cleopherus Smith
FINDINGS OF FACT In 1970, petitioner Abdul Jalil al-Hakim (al-Hakim) began to negotiate contracts for professional athletes. He operated as a sole proprietor under the name "Superstar Management, the Genius of Randy Wallace" and maintained a business checking account (business account) at Lloyd's Bank in Oakland, California. al-Hakim and the athletes executed special powers of attorney which *140 authorized al-Hakim to negotiate contracts for them and provided that al-Hakim was to receive a fee for any contract he negotiated. The Special Power of Attorney, which al-Hakim and the athletes used during the years at issue, was as follows: SPECIAL POWER OF ATTORNEY
KNOW ALL MEN BY THESE PRESENTS, That I,    , Player, of       have made, constituted, and appointed, and by these presents, do make, constitute, and appoint Abdul-Jalil al-Hakim, acting exclusively for and on behalf of Super Star Management, A California Entity, my true and lawful attorney for me and in my name, place and stead to: Negotiate on behalf of myself and advise me as to any and all contractural agreements with respect to ORGANIZED PROFESSIONAL ATHLETICS. This Power of Attorney extends to and includes negotiations by and between myself and any and all specific teams of any league. Giving and granting unto said attorney full power and authority to do and perform every act necessary and proper to be done in the exercise of any of the foregoing powers as fully as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that *141 my said attorney shall lawfully do or cause to be done by virtue hereof. This Power of Attorney is granted for a period of      , and shall become effective on      , and shall terminate on      . For value received, receipt of which is hereby acknowledged, I do hereby grant said attorney in fact, all expenses at my cost, and the sum, whichever is greater, of a minimum fee of one thousand dollars ($1,000.00) or a FIVE per cent (5%) interest, in any contractual agreements with respect to organized professional athletics, and by such grant do intend that this Power of Attorney be coupled with an interest, and I do hereby make and declare this Power of Attorney to be irrevocable by me or otherwise, renouncing all right to revoke this power or to appoint any other person to perform any of the acts enumerated herein. I further agree to execute any and all documents necessary to facilitate payments of obligations arising from this contract. My repayment schedule is as follows: Expense Retainer Fee of $300.00 due upon signing Agency Agreement and FIVE (5%) PERCENT of contract due upon signing. Minimum fee reduced to $500.00.
I hereby understand and agree *142 that this agreement is enforceable in California, and that California law shall govern the interpretation of this agreement. WITNESS MY HAND, this     day of      , 19  . Signed by Abdul Jalil al-Hakim, SUPER STAR MANAGEMENT PLAYER WITNESS BY: During 1977 and 1978, al-Hakim represented several professional baseball players, including Alvin Moore (Moore), and Cleopherus Smith (Smith). al-Hakim represented Moore during 1977 and negotiated with the Atlanta Braves and the Chicago White Sox (White Sox) on his behalf. al-Hakim was successful in negotiating a contract for Moore with the White Sox. Said contract, which Moore and Roland A. Hemond, Vice President of the White Sox, signed, was as follows: THE AMERICAN LEAGUE OF PROFESSIONAL BASEBALL CLUBS Parties Between CHICAGO WHITE SOX, DIVISION OF ARTNELL CO. herein called the Club, and ALVIN EARL MOORE of RICHMOND, CALIFORNIA, herein called the Player. Recital The Club is a member of The American League of Professional Baseball Clubs, a voluntary association of member Clubs which has subscribed to the Major League Rules with The National League of Professional Baseball Clubs and its constituent *143 Clubs and to The Professional Baseball Rules with that League and the American Association of Baseball Leagues. Agreement In consideration of the facts above recited and of the promises of each to the other, the parties agree as follows: Employment 1. The Club hereby employs the Player to render, and the Player agrees to render, skilled services as a baseball player during the year(s) 1978 and 1979 including the Club's training season, the Club's exhibition games, the Club's playing season, the League Championship Series and the World Series (or any other official series in which the Club may participate and in any receipts of which the Player may be entitled to share). Payment 2. For performance of the Player's services and promises hereunder the Club will pay the Player the sum of $65,000.00 (SIXTY FIVE THOUSAND DOLLARS) FOR 1978 and $85,000.00 (EIGHTY FIVE THOUSAND DOLLARS) IN 1979, in semi-monthly installments after the commencement of the playing season covered by this contract except as the schedule of payments may be modified by a special covenant. Payment shall be made on the day the amount becomes due, regardless of whether the Club is "home" or "abroad". *144 If a monthly rate of payment is stipulated above, it shall begin with the commencement of the Club's playing season (or such subsequent date as the Player's services may commence) and end with the termination of the Club's scheduled playing season and shall be payable in semi-monthly installments as above provided. Nothing herein shall interfere with the right of the Club and the Player by special covenant herein to mutually agree upon a method of payment whereby part of the Player's salary for the above year can be deferred to subsequent years. * * * The Player is to receive a cash payment of $50,000.00 (Fifth Thousand Dollars) on January 2, 1978 for signing this contract. * * * Approval This contract or any supplement hereto shall not be valid or effective unless and until approved by the League President. Signed in duplicate this 9th day of December, A.D. 1977. (Signed) Alvin Earl Moore 3728 Wall Ave. Richmond, Calif. 94806 Social Security No. 559-70-XXXX
Approved JAN 19 1978 CHICAGO WHITE SOX, DIVISION OF ARTNELL CO. By Roland A. Hemond, Vice President RECEIVED FEB 1 1978 (Signed) President, The American League of Professional Baseball Clubs PLAYER *145 RELATIONS COMMITTEE It was customary in the baseball industry for a baseball team to send a baseball player's bonus to his agent and, on November 22, 1977, the White Sox wired Moore's $50,000 bonus to al-Hakim's business account. The White Sox also sent al-Hakim the following letter: Dear Abdul: Enclosed is a copy of the 1978 and 1979 Chicago White Sox contract for Player Alvin E. Moore as negotiated recently. I also sent you a confirming wire regarding the conditions of this contract. Two copies of this contract have been sent to Alvin Moore at the Mochis Baseball Club, Apartado Postal 349, Los Mochis, Sinaloa, Mexico. I trust you will find everything in order and ready for signature. Further, on November 22, 1977, $50,000.00 was wired to Lloyd's Bank, Temescal Branch, 4900 Telegraph Avenue, Oakland, California 94609, to be deposited in Account #0112-000-28 for the account of Alvin M. Moore as a loan payment to be repaid to the Chicago White Sox on January 2, 1978, when a cash payment of $50,000.00 is due player Moore for signing this contract. By copy of this letter, we are asking Alvin to sign a copy of this letter and return it to me for the files of our Accounting *146 Department substantiating receipt of the $50,000.00 at Lloyd's Bank as outlined above. I would also appreciate your signing a copy of this letter and returning it to me so that we may place a letter with your signature and a letter with the signature of Alvin in our files. We are happy to have Alvin join our organization and we wish him much success with the White Sox for many years to come. We are pleased that both Alvin Moore and Cleopherus Smith are joining our organization together. Best regards. Sincerely yours, Roland A. Hemond, Vice President The above letter is approved & accepted and receipt of $50,000.00 is hereby acknowledged. Abdul Jalil The above letter is approved & accepted and receipt of $50,000.00 is hereby acknowledged. Alvin E. Moore Of the $50,000 loan which the White Sox wired to al-Hakim's business account, al-Hakim transferred $34,300 to Moore's mother on November 23, 1977 and $5,000 to Moore on January 30, 1978. He retained in his business account the remaining $10,700. Moore and Roland A. Hemond, the Vice President of the White Sox, signed the contract on December 9, 1977. The president of the American League of Professional Baseball *147 Clubs signed the contract on January 19, 1978. al-Hakim represented Smith during 1977 and negotiated a contract for him with the White Sox. Under the terms of the contract, the White Sox were to pay a $20,000 signing bonus to Smith on January 2, 1978. On November 23, 1977, the White Sox wired $20,000 to al-Hakim's business account and treated the transfer as a loan which Smith was to repay on January 2, 1978, the date the bonus was due. Of the $20,000 loan, petitioner gave $17,750 to Smith and retained the remaining $2,250 in his business account. al-Hakim filed his 1977 and 1978 Federal individual income tax returns on a calendar year basis and used the cash receipts and disbursements method of accounting. He did not report any income from Moore or Smith on his 1977 Federal individual income tax return (1977 return). He reported $10,000 from Moore and $1,750 [4] from Smith on his 1978 Federal individual income tax return (1978 return). *148 The issues, which we must decide, are: 1) whether al-Hakim should have reported $10,700 from Moore, instead of $10,000; and 2) whether al-Hakim should have reported his fees from Moore and Smith on his 1977 return, instead of his 1978 return. OPINION How Much Income Did al-Hakim Receive From Moore?
Respondent contends that al-Hakim received income in the amount of $10,700, the amount which al-Hakim retained in his business account. Although al-Hakim did not brief this specific issue, we infer from numerous statements at trial and on brief that he believes that he received income in the amount of only $10,000. Section 61(a)(1) provides in part that gross income includes compensation for services and fees. Agents, however, do not have to include in gross income amounts which they receive and hold on behalf of a principal. [5]
In the present case, the Special Power of Attorney provided that al-Hakim's fee would be the greater of 5 percent of the total contract amount or $500. Moore's total contract amount was $200,000 -- $85,000 *149 in 1978, $65,000 in 1979 and a $50,000 signing bonus. The greater of 5 percent of $200,000 and $500 is $10,000. Thus, al-Hakim's fee was $10,000. Unlike the $10,000 to which al-Hakim was contractually entitled, al-Hakim had no claim of right to $700 of the $10,700 which remained in his business account. al-Hakim was Moore's agent. As was customary in the industry, the White Sox wired Moore's bonus to his agent, who, in this case, was al-Hakim. Although the record does not explain what al-Hakim did with the remaining $700, [6] al-Hakim testified that "* * * [the $50,000] payment was a loan to Mr. Moore, so I was actually obligated and held to submit that [money] to Mr. Moore, or at his discretion, do whatever he decided best * * *." A November 22, 1977 letter addressed to petitioner from the White Sox stated that the $50,000 was deposited in petitioner's business account as a loan to Moore. Based on the record before us, we hold that al-Hakim had income in the amount to which he was contractually entitled -- $10,000. We further hold *150 that during 1977, [7] al-Hakim held the remaining $700 in his capacity as Moore's agent and that, therefore, said amount is not includable as income on his 1977 return. [8]
Which Year Should Petitioner Report His Income?
Respondent contends that al-Hakim negotiated the contracts for Moore and Smith (the baseball players) in 1977 and received his fee in 1977 via the White Sox' wire transfers to his business account. Respondent further contends that petitioner was entitled to his fee in 1977, the year in which the baseball players and the White Sox signed the contracts. [9]
al-Hakim contends that the amounts, which the White Sox deposited into his account, were loans to *151 the baseball players, and that he held said amounts on their behalf. Petitioner further contends that he was not entitled to his fees until 1978, the year the president of the American League signed and approved the contracts. Under the cash receipts and disbursements method of accounting, income is to be included in gross income for the taxable year in which it is actually or constructively received. Section 1.451-1(a), Income Tax Regs.
Section 1105 of the California Commercial Code provides, inter alia, that: § 1105. Territorial Application of the Act; Parties' Power to Choose Applicable Law. (1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of such other state or nation shall govern their rights and duties. Failing such agreement this code applies to transactions bearing an appropriate relation to this State. California law provides that "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting * * *." California Civil Code, sec. 1636 *152 . A contract is to be construed in light of the surrounding circumstances. California Civil Code sec. 1647. A contract must, if possible, be given a reasonable rather than an unreasonable construction. California Civil Code sec. 1643; Broome v. Broome,231 Pac. 2d 171 (1951). The two sets of documents, which set forth the terms of petitioner's fee, are: 1) the Special Powers of Attorney and 2) the players' contracts with the White Sox. The Special Powers of Attorney, which al-Hakim and Moore and Smith used, provided that al-Hakim's "* * * repayment schedule [was] as follows: Expense Retainer Fee of $300.00 due upon signing Agency Agreement and FIVE (5%) PERCENT of contract due upon signing * * *." (Emphasis in original.) The contracts, which Moore and Smith and the White Sox signed, provided that "This contract or any supplement hereto shall not be valid or effective unless and until approved by the League President." [10] The contracts also provided spaces for three signatures: the player's, the vice president of the White Sox, and the president of the American League. *153 Pursuant to the Special Powers of Attorney, al-Hakim's fee was "due upon signing." The baseball players and the White Sox signed the contracts in 1977. [11] The president of the American League also signed the contracts, but not until 1978. If the phrase "due upon signing" refers to the date that the baseball players and the White Sox signed the contracts, al-Hakim's fees would be due in 1977. If the phrase refers to the date that the baseball players, the White Sox, and the president of the American League signed the contracts, al-Hakim's fee would be due in 1978. In the instant case, we believe that the parties implicitly understood that the phrase "due upon signing" meant due upon signing a valid contract. The players' contracts stated that said contracts would be valid if and when the League president approved them and specifically provided three signature lines on which the player, the White Sox, and the League president were to sign. We find that al-Hakim was not entitled to his fees before the League president approved and signed the contracts. Accordingly, al-Hakim properly reported his fees on his 1978 return. Income From Lyman *154 Bostock
FINDINGS OF FACT During 1977, al-Hakim represented Lyman Bostock (Bostock), a professional baseball player, and negotiated on his behalf with 18 teams, including the Minnesota Twins and the California Angels (Angels). al-Hakim was successful in negotiating a five-year contract for Bostock with the Angels. Bostock and the Angels signed the contract on November 21, 1977 and the American League of Professional Baseball Clubs signed it on January 4, 1978. Under the terms of the contract, the Angels were to pay to Bostock a total of $2,250,000. Pursuant to a deferred-compensation-agreement, Bostock was to receive said $2,250,000 over 12 years - $195,000 per year for the first five years, and the remaining $1,275,000 over the next seven years. al-Hakim's fee for negotiating Bostock's contract was $112,500, i.e., 5 percent of the $2,250,000 contract amount. Bostock was to pay the fee over ten years and in ten equal installments of $11,250 per year. A letter from al-Hakim to Bostock stated: Dear Lyman, As per our conversation Jan. 1, 1978, I am sending you this letter to consummate our agreement. A) Your fee of $112,500 due SUPER STAR MANAGEMENT upon league approval *155 of your contract is to be paid at the rate of $11,250 a year for ten (10) years beginning [sic] July 1, 1978 and is to be paid each July 1st thereafter. You are aware that this is a ten year repayment schedule and that it is less than the paying term of your contract, however you desire it to be repaid as scheduled. B) You are providing SUPER STAR MANAGEMENT with an interest free loan in the amount of $112,500 by Jan. 15, 1978. This loan is to be repaid at the rate of $11,250 a year for ten (10) years begining [sic] Dec. 30, 1978 and is to be paid each Dec. 30th thereafter. The interest [sic] free loan should be sent by bank money wire to: SUPER STAR MANAGEMENT, % LLOYDS BANK, TEMESCAL BRANCH, 4900 Telegraph Ave, Oakland, CA 94609, Attention: MARIE SILVA, (415) 653-5277 Respectfully, Abdul-Jalil In January 1978, the Angels loaned to Bostock $112,500, and on January 13, 1978, Bostock loaned to al-Hakim $112,500. In May 1978, al-Hakim billed Bostock $11,250 for the first installment of his $112,500 fee. al-Hakim, as payment for the $11,250 installment, reduced the amount, which was shown as a loan from Bostock to him, to $101,250 ($112,500 - $11,250) and reported *156 $11,250 in income from Bostock on his 1978 Federal individual income tax return. On May 18, 1978, al-Hakim incorporated his sole proprietorship, "Superstar Management, The Genius of Randy Wallace," by transferring all its assets and liabilities, including the account receivable from, and loan payable to, Bostock, to a newly formed corporation, "The Genius of Randy Wallace, Inc." (Genius, Inc.). In June 1978, a dispute, which concerned the terms of Bostock's contract, arose between Bostock and the Angels. As part of a settlement agreement, Bostock reported the loan from the Angels as income and deducted the balance of the fee he owed al-Hakim/Genius, Inc., as an expense. Genius, Inc., reported $101,250, the balance of the fee due al-Hakim/Genius, Inc., as income on its Federal corporate income tax return and reduced to zero the amount of the loan, which al-Hakim/Genius, Inc., owed Bostock. OPINION Respondent contends that petitioner was entitled to a fee from Bostock in the amount of $112,500, and al-Hakim received said amount on January 13, 1978, the date on which Bostock "loaned" al-Hakim $112,500. Petitioner contends that the $112,500, which Bostock transferred to him, *157 was a loan. Petitioner further contends that pursuant to his arrangement with Bostock, he was entitled to only $11,250 of his fee in 1978, and pursuant to the settlement agreement, Genius, Inc., was entitled to the remaining part of his fee which was $101,250. In the present case, petitioner testified that the $112,500, which Bostock transferred to him, was a loan, and the letter, which al-Hakim sent to Bostock, supports al-Hakim's testimony. Pursuant to the terms of the contract between al-Hakim and Bostock, Bostock was to pay al-Hakim's fee over 10 years and in 10 equal installments of $11,250 per year. Based on petitioner's testimony and its supporting documentation, we find that the $112,500, which Bostock transferred to al-Hakim on January 13, 1978, was a loan, and not the payment of his $112,500 fee. Respondent also contends that the transfer of the $112,500 accounts receivable to Genius, Inc., was an impermissible assignment of income. al-Hakim contends that, in the context of a section 351 transfer, the assignment of income doctrine is not applicable. We agree with petitioner. See Kniffen v. Commissioner,39 T.C. 553, 564-565 (1962); See also Hempt Bros., Inc. v. United States,490 F.2d 1172 (3d Cir. 1973), *158 cert. denied, 419 U.S. 826 (1974). (Assignment of income doctrine held not applicable when accounts receivable were transferred in the context of a section 351 transfer.) [12]
Miscellaneous Income Items
FINDINGS OF FACT On April 26, 1977, Smith reimbursed al-Hakim $300 for expenses that al-Hakim incurred in negotiating Smith's contract. On May 16, 1977, Moore paid al-Hakim $1,152.52 of which $252.52 constituted reimbursement for telephone and other expenses that al-Hakim incurred in negotiating Moore's contract. On June 19, 1977, Bostock paid al-Hakim $638.76 of which $138.76 constituted reimbursement for expenses that al-Hakim incurred in negotiating Bostock's contract. In September 1977, Bryan Taylor, a professional basketball player who played for the Denver Nuggets, paid $1,272 to al-Hakim for expenses which al-Hakim incurred in negotiating Taylor's contract. OPINION Respondent contends that al-Hakim should include the amounts enumerated above in his gross income. Petitioner does not *159 address this issue. Gross income means all income from whatever source derived. Section 61(a). The burden of proof with respect to this issue is on al-Hakim. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The parties have stipulated that part of the payments were for reimbursement of expenses. Petitioner testified that $500 of the $638.76, which Bostock gave to petitioner, was a fee. The record fails to explain why the athletes gave the remaining amounts to petitioner. We find that the entire amounts are includible in gross income. Section 61(a); Welch v. Helvering,supra.
New Jobs Credit
FINDINGS OF FACT On his 1977 Federal individual income tax return, al-Hakim reported net earnings from his sole proprietorship in the amount of $1,020. The parties have stipulated that petitioner overstated his business deductions on said return in the amount of $2,090. We have found supra that petitioner should report as business income miscellaneous payments which totalled $3,363.28. [13]
*160 During the fiscal year ended April 30, 1979, Genius, Inc. paid to petitioner a salary of $40,000 of which Genius, Inc., paid $35,000 in 1978. On its Federal Corporate Income Tax Return, Genius, Inc., claimed a new jobs credit in the amount of $1,050. OPINION During 1978, section 51(a)(2) provided that the amount of the new jobs' credit [14] was: for a taxable year beginning in 1978, an amount equal to 50 percent of the excess of the aggregate unemployment insurance wages paid during 1978 over 102 percent of the aggregate unemployment insurance wages paid during 1977. "Unemployment insurance wages" (U.I.W.) had the same meaning as wages, except that it was limited to $4,200 per employee. Section 51(f)(1). Furthermore, section 52(e) provided: CHANGE IN STATUS FROM SELF-EMPLOYED TO EMPLOYEE. -- If -- (1) during 1976 or 1977 an individual has net earnings from self-employment (as defined in section 1402(a)) which are attributable to a trade or business, and (2) for any portion of the succeeding calendar year such individual is an employee of such trade or business, *161 then, for purposes of determining the credit allowable for a taxable year beginning in such succeeding calendar year, the employer's aggregate unemployment insurance wages for 1976 or 1977, as the case may be, shall be increased by an amount equal to so much of the net earnings referred to in paragraph (1) as does not exceed $4,200. In the instant case, petitioners' net earnings from his sole proprietorship for 1977 was $6,474 [$1,020 reported on return + $2,090 overstated deductions + $3,363 underreported income]. Petitioners' U.I.W. for 1977 was, however, limited to $4,200. See sections 52(e) and 51(f). Petitioners' wages in 1978 were $35,000 and his U.I.W. for 1978 was again limited to $4,200. See section 51(f). Pursuant to section 51(a)(2), Genius, Inc.'s, new job credit would be equal to 50% X [U.I.W. for 1978 - (102% X U.I.W. for 1977)] or 50% X [$4,200 - $4,284]. Because there was no "excess" U.I.W., Genius, Inc., was not entitled to a new jobs credit. Section 6653(a) Additions to Tax
FINDINGS OF FACT Petitioner reported gross receipts from his sole proprietorship on his 1977 Federal individual income tax return (1977 return) in the amount of *162 $17,650. Pursuant to our findings, supra, petitioner had, as a minimum, total gross receipts in 1977 computed as follows: Smith
$ 300.00
Moore
1,152.52
Taylor
[15] 15,000.00
Taylor
1,272.00
Bostock
638.76
Total
$18,363.28
Petitioner claimed business deductions on his 1977 return in the amount of $16,630 but was entitled to only $14,540. Petitioner received $2,250 from Smith in 1978 and reported only $1,750 of said amount on his 1978 Federal income tax return (1978 return). [16] Petitioner claimed business deductions on his 1978 return in the amount of $39,808 but was entitled to only $35,146. Genius, Inc., claimed business deductions on its Federal corporate income tax return for the fiscal year ending 4/30/79 in the amount of $50,700 but was entitled to only $47,012. OPINION Section 6653(a) imposes a five percent addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Negligence has been found when gross income was understated or deductions were overstated. See *163 Anders v. Commissioner,68 T.C. 474, 493 (1977) (gross income understated); See Bunnel v. Commissioner,50 T.C. 837, 843 (1968) (deductions overstated). al-Hakim understated his gross receipts and overstated his deductions for the taxable years 1977 and 1978 and has failed to explain such under/overstatements. Accordingly, respondent's determination is sustained. See Anders v. Commissioner,supra, and Bunnel v. Commissioner,supra.
Genius, Inc., overstated its deductions by $3,688 ($50,700 - $47,012) for the taxable year ended April 30, 1979. Genius, Inc., has failed to explain said overstatement, and, accordingly, respondent's determination is sustained. See Bunnel v. Commissioner,supra.
Section 6651(a)(1) Additions to Tax
FINDINGS OF FACT Douglas Freeman (Freeman), a Certified Public Accountant, prepared al-Hakim's Federal individual income tax returns for the taxable years 1977 and 1978 from information that al-Hakim supplied. Petitioner filed his Federal individual income tax return for the taxable year 1977 on June 8, 1978. On April 14, 1979, petitioner filed *164 an Application for Automatic Extension of Time to File U.S. Individual Income Tax Return (Form 4868) requesting an automatic two month extension of time to file his 1978 income tax return. On June 14, 1979, petitioner filed a second Application for Extension of Time to File U.S. Individual Income Tax Return (Form 2688) requesting an extension of time until September 15, 1979 to file his 1978 income tax return. Respondent approved the extension to September 17, 1979. On September 14, 1979, petitioner filed a third application for extension of time (Form 2688) requesting an extension until October 15, 1979 to file his 1978 income tax return. Respondent approved the extension until October 15, 1979. Petitioner filed his Federal individual income tax return for the taxable year 1978 on October 27, 1980. OPINION Section 6072(a) provides that income tax returns made on the basis of a calendar year shall be filed on or before the 15th day of April following the close of the calendar year. Section 6651(a)(1) imposes an addition to tax if a return is not filed on the date prescribed (determined with regard to any extension of time for filing) unless it is shown that such failure is due *165 to reasonable cause and not due to willful neglect. Respondent raised the section 6651(a)(1) additions in amended answers, and the burden of proof is, therefore, on him. See Rule 142(a). In order for the addition not to apply, the late filing must be due to reasonable cause and not to willful neglect. Sec. 301.6651-1(a)(1), Procedural and Administrative Regs. In the present case, the record does not support a finding that the addition applies, and respondent has failed to carry his burden of proof. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: The Genius of Randy Wallace, Inc., docket No. 8173-83; and Abdul Jalil Al-hakim docket No. 34225-83.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. The burden of proof is on respondent for the issues asserted in the amended answers. Rule 142(a).↩
4. Although al-Hakim retained $2,250 of the $20,000, which the White Sox loaned to Smith, he reported only $1,750 on his Federal individual income tax return. Respondent contends, and al-Halim conceded on brief, that al-Hakim should have reported $2,250 from Smith.↩
5. See Cataldo v. Commissioner,T.C. Memo. 1971-219, affd. on another issue 476 F.2d 628↩ (2d Cir. 1973).
6. The record may fail to explain what happened to the $700 because petitioner apparently did not know that this amount was at issue.↩
7. Respondent has not plead, or argued, in the alternative that if the $700 amount at issue was not income in 1977, it would be income in a year other than 1977.↩
8. See Cataldo v. Commissioner,supra,↩ n.5.
9. Moore and Roland A. Hemond signed Moore's contract on December 19, 1977. The record is equivocal as to when Smith and a White Sox representative signed Smith's contract. al-Hakim, however, does not argue that the parties signed Smith's contract in a year other than 1977.↩
10. Although the record does not contain the contract, which Smith and the White Sox signed, petitioner testified that his fee from Smith "* * * would become due at the time the league approved [Smith's] contract."↩
11. See supra,↩ n.9.
12. See also Briggs v. Commissioner,T.C. Memo. 1956-86↩ (transferor not taxable on accounts receivable transferred to newly formed corporation).
13. ↩
(From Smith)
$ 300.00
(From Moore)
1,152.52
(From Bostock)
638.76
(From Taylor)
1,272.00
$3,363.28
14. In 1978, the Revenue Act of 1978 replaced the new jobs credit with the targeted jobs credit.↩
15. al-Hakim received and reported a $15,000 fee from Taylor on his 1977 return.↩
16. See supra,↩ n.4.