WILLIAM G. HOCK AND MILDRED L. HOCK, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hock v. Commissioner
Docket Nos. 6379-76; 7742-77; 12326-77; 6772-78.
United States Tax Court
T.C. Memo 1987-444; 1987 Tax Ct. Memo LEXIS 441; 54 T.C.M. (CCH) 406; T.C.M. (RIA) 87444; September 2, 1987
Brad S. Ostroff and Stephen E. Silver, for the petitioners (Hock) in docket Nos. 6379-76, 7742-77, 6772-78. David L. Haga, for the petitioners (Cooper) in docket Nos. 7742-77, 6772-78. A. Jerry Busby, for the petitioners (Lindner) in docket Nos. 6379-76, 7742-77, 6772-78 and petitioners (Richard and Rachelle Giorza) in docket No. 6379-76. Florence L. Mercer, pro se. Paul W. Mercer, Sr., pro se. Hubert E. Kelly, for the petitioners (Kron) in docket No. 12326-77. Stephen J. Waller and Martha Combellick, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, respondent determined deficiencies and additions to tax in petitioners' Federal income tax as follows: Additions to Tax
Petitioner
Year
Deficiencies
6653(a) [2]
6651(a)(1)
6654(b)
William G. &
Mildred L. Hock
1972
$ 4,303.28
$ 215.16
--
--
1973
2,123.57
106.18
--
--
1974
645.00
32.00
--
--
1975
282.00
14.00
--
--
Walter E. Lindner, Jr.
& Thelma B. Lindner
1972
10,386.00
519.30
--
--
1973
9,261.00
463.00
--
--
1974
11,180.00
559.00
--
--
1975
11,534.00
577.00
--
--
Richard G. and
Rachelle M. Giorza
1972
5,342.44
267.12
--
--
Paul W. Mercer, Sr.
1972
8,623.00
431.00
--
--
Florence L. Mercer
1972
8,323.00
416.00
2,081.00
266.00
Robert J. Cooper
1970
158.26
7.91
--
--
1972
2,591.00
130.00
--
--
1973
10,719.00
536.00
--
--
1974
35,325.00
1,766.00
--
--
1975
20,569.00
1,028.00
--
--
Lester E. & Louise
Kron
1973
23,530.00
1,176.00
--
--
*443 The issues for decision are: 1) whether petitioners are entitled to the deductions attributable to the Pine Mountain Mercury Mine; 2) whether petitioners are entitled to deduct the cost of constructing the Giorza home; 3) whether petitioners are entitled to miscellaneous deductions; 4) whether Paul and Florence Mercer had unreported income; 5) whether Paul Mercer is entitled to miscellaneous deductions; 6) whether petitioners are liable for the section 6653(a) addition to tax; and 7) whether Florence Mercer is liable for the sections 6651(a) and 6654 additions to tax. For convenience, we have combined our Findings of Fact and Opinion by issues. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated by this reference. General Facts
The deficiencies in this case arise primarily from respondent's disallowance of deductions from L & M Investments (L & M), a limited partnership which Walter E. Lindner (Lindner) and Paul W. Mercer, Sr. (Mercer) formed in 1971 to pool their resources for *444 investment. During the years in issue, the years 1972 through 1975, L & M had at various times several partners, including Lindner, Mercer, William G. and Mildred L. Hock (the Hocks), Richard G. and Rachelle M. Giorza (the Giorzas), Florence L. Mercer, Robert J. Cooper (Cooper), and Lester E. and Louise Kron (the Krons). During 1972 through 1975, 6009 East Osborn, Phoenix, Arizona was L & M's principal place of business and the residence of Mercer. L & M's partnership tax returns, which Mercer's mother prepared, indicated that the only real property that it held in the Phoenix Metropolitan area was the residence located at 6009 East Osborn, Phoenix, Arizona. In January 1972, L & M received from an Arizona Bank a $ 5,000 unsecured loan which was to be paid from Lindner's tax refunds, and as a secondary source, Lindner's and Mercer's income. During 1972, L & M opened bank accounts at the Arizona Bank, Phoenix, Arizona, the Continental Bank, Phoenix, Arizona, and the First National Bank, Pine Top, Arizona. Mercer, a lawyer who practiced in Phoenix, Arizona, was the managing partner of L & M. He controlled the day-to-day activities, including the desposits to, and except for *445 the bank account in Pine Top Arizona, the disbursements from, L & M's bank accounts. On L & M's partnership income tax returns (Forms 1065) for the taxable years 1972 through 1975, the schedules K-1 reported each partners' distributive share of partnership (losses) as follows: Partner
1972
1973
1974
1975
William G. Hock
(19,362.82)
(84,673.02)
(12,411.28)
(4,885.38)
Walter E. Lindner
($ 30,980.51)
($ 225,794.71)
($ 124,112.83)
($ 48,853.80)
Richard C. Giorza
(19,362.82)
--
--
--
Paul W. Mercer
(3,872.56)
(225,794.70)
(93,084.62)
(36,640.35)
Robert J. Cooper
--
(56,448.68)
(96,187.44)
(37,861.70)
Lester E. Kron,
--
(225,794.70)
(124,112.83)
(48,853.80)
M.D.
Charles Dersham
(3,872.56)
--
--
--
Richard A. Wilson
--
(84,673.02)
(46,542.31)
(18,320.17)
John A. Bacon
--
(225,794.71)
(124,112.83)
(48,853.80)
TOTALS
($ 77,451.27)
($ 1,128,973.54)
($ 620,564.14)
($ 244,269.00)
Said partners reported losses from L & M, which respondent disallowed, as follows: Amount
Petitioner(s)
Year
Income/(Loss)
The Hocks
1972
($ 19,362.82)
1973
[3] (11,390.00)
1974
[3] (4,132.00)
1975
(4,885.00)
The Lindners
1972
($ 30,981.00)
1973
(225,795.00)
1974
(124,113.00)
1975
(48,854.00)
The Giorzas
1972
(19,363.00)
Mercer
1972
(3,872.56)
Cooper
1973
(56,449.00)
1974
(96,187.00)
1975
[3] (50,868.00)
The Krons
1973
(225,795.00)
*446 The deficiencies in this case result primarily from petitioners' "investments" in L & M, and specifically, two of L & M's investments: (1) the Pine Mountain Mercury Mine and (2) a house and land in Pinetop, Arizona. Pine Mountain Mercury Mine
FINDINGS OF FACT The Pine Mountain Mercury Mine (the mine) is in central Arizona and consists of 21 mining claims which are named Turnbull No. 1 through No. 8 and No. 10 through No. 22. William Rogers, Charles MacFarland and William Boardman originally located the Pine Mountain mining claims in September 1925. The operators of the mine developed the mine and produced flasks of ore for 20 years, i.e., 1925-1945. The operators stopped work in 1945 because the price of mercury had fallen and there was some dissension at the mine. George Cline "relocated" the mine in 1945 or 1946 as the Turnbull group of mining claims, but despite a rise in the price of mercury, there was comparatively little activity at the mine from 1945 to 1959. On November 19, 1959, John A. Bacon (Bacon), Mercer's *447 uncle, acquired a lease and an option to purchase 12 unpatented lodge-mining claims known as Turnbull Nos. 1 through 12. The lease provided that Bacon could work the claims for a period of 10 years, beginning on November 19, 1959, and that he had the right to renew said lease for an additional 10-year period provided that he complied with all the terms of the lease and option. The option provided that Bacon could purchase the Turnbull mining claims Nos. 1 through 12 for a total of $ 300,000. On December 23, 1959, Bacon transferred a one-third interest as lessee, under the lease and option agreement, to William L. and Myrtle L. Brunson (the Brunsons). On May 8, 1964, Francis H. Frederick, a mining geologist, surveyed and evaluated the mine and, on August 8, 1964, prepared a report (the Frederick report) on the mine. In the Spring of 1965, William Buchecker (Buchecker), vice president of Harpoon, Inc. (Harpoon), a subsidiary of United Nuclear Corp. (United Nuclear), and George Hazlett, the chief geologist for Harpoon, visited the mine to evaluate the possible purchase of it. During the visit, they walked through the accessible areas of the mine and took "channel samples." The *448 mine was in relatively poor condition; the shaft was collapsed, the mill was dilapidated and there was no hoist or headframe beam, making it impossible to lower or raise men and material in the shaft had the shaft been open. Following this visit, Buchecker lost interest for the stated reason that the Bacons requested a downpayment which was too high. On July 19, 1965, the Brunsons sold their undivided one-third interest as lessees in mining claims Turnbull Nos. 1 through 12 to Floyd and Lucille Stone (the Stones), the son-in-law and daughter, respectively, of the Bacons. The purchase price was $ 45,000, including a $ 500 downpayment. The Brunsons sold their lease with option to the Stones with the knowledge that a sale was being negotiated with an interested company, and that said company had offered a $ 75,000 downpayment plus a 12.5 percent royalty no to exceed $ 3,000,000. They also sold their one third interest with the understanding that a title search revealed certain defects in their title, and that the Stones purchased the interest to clear the title and to effect a second sale. In October 1965, the Bacons recontacted Buchecker and advised him that they had reduced the *449 amount of the downpayment that they were requesting. Buchecker and United Nuclear's attorney flew to Arizona and negotiated a purchase of the mining property by Harpoon for $ 10,000,000 payable as follows: 1) a $ 75,000 downpayment, and 2) the balance payable solely out of production of the mine through a 12.5 percent royalty on all ores, minerals and other products mined and removed from the mining property, including flasks of mercury produced, with a minimum royalty of $ 1,500 per month terminable at will by Harpoon. The annual average price for mercury per flask of 76 pounds of mercury for the period 1965 to 1975 was as follows: Year
Price
1965
$ 570.75
1966
441.72
1967
489.36
1968
535.56
1969
505.04
1970
407.77
1971
292.41
1972
218.28
1973
286.23
1974
281.67
1975
158.12
As of the date of sale, the Bacons owed the original lessors and optionors $ 293,075.45, pursuant to the terms of the lease with option [4] to purchase dated November 19, 1959, and the Stones owed the Brunsons $ 44,500.00 pursuant to the lease with option to purchase dated July 19, 1965. The Bacons assumed sole responsibility for the payments required by the contracts *450 and agreed to pay the outstanding liabilities from the $ 1,500 monthly installments which Harpoon/United Nuclear was to pay them. Starting in December 1965, United Nuclear rehabilitated the dilapidated mine and surface equipment. United Nuclear developed and worked the property for approximately 1-1/2 years and left the mine in the late spring or early summer of 1967. Because the mine produced little ore, United Nuclear never paid more than the minimum payment of $ 1,500 per month. United Nuclear terminated the arrangement and left the mine because, and when, Buchecker realized that United Nuclear had lost $ 350,000 to $ 400,000. In April 1969, Dixilynn Corporation (Dixilynn) acquired a leasehold interest in the mine. On July 2 and 3, 1969, Fred Johnson (Johnson), a geologist for Dixilynn, surveyed the mine and evaluated its mining potential. The mine shaft was partially caved and parts of the mine were flooded and inaccessible. Johnson concluded that the mine could be developed into a profitable, low-tonage mine and recommended the following: 1) install headframe and *451 hoist; 2) repair shaft and collar; 3) pump the shaft; 4) overhaul the compressor and motor; 5) check the air and water lines; 6) install the necessary pipe and track; 7) replace condenser tubes; 8) heat and level the rotary furnace; 9) remove jaw crusher and either replace it or install a crusher and bucket elevator at the coarse ore bin; 10) bring electrical power to the property either from the main power lines or installation of generators; and 11) open the springs on the property and install a reservoir. Dixilynn hired Jefferson Clapton (Clapton) as project manager at the mine to map and sample the property, drill to establish ore reserves, and develop the property. Mining industry companies test, investigate, or explore a prospective mine by the use of three procedures: 1) establishing control maps and geological maps; 2) sample all occurrences of ore, both on the surface and underground, i.e., cut grooves across a vein to learn the grade, widths, and general trending of mineralization; and 3) perform some kind of exploration tool, usually diamond drilling, to establish ore reserves and extensions of ore bodies. Johnson sent a geologist, Bob Watson, to *452 the Pine Mountain Mine, and Watson completed all the geological mapping. Johnson was in charge of all surface and underground channel samples and supervised the channel sampling at the mine which was routinely done on the vein of the ore underground, and also at any location where there was any evidence of mercury mineralization. Johnson sent all the samples to the Dixilynn laboratory in Colorado where the lab assayed and analyzed them. Johnson selected the location, depth, and direction of all core drilling at the mine. He initially recommended underground drilling, but after doing the sampling, the chief geologist in Colorado decided that surface drilling should be done first. Subsequent to the surface drilling, the geologist in Colorado decided that it was not worthwhile to attempt drilling underground. Clapton and the chief geologist from Colorado reviewed the cumulative data from the three procedures and decided that 1) the property was uneconomical and 2) to terminate their lease on the property as of March 1, 1970. Dixilynn spent approximately $ 40,000 developing and exploring the mine. Clapton filed a final written report to Richard J. Fiorini, vice president of *453 Dixilynn, on April 23, 1970. Said report stated, inter alia, the following: EQUIPMENT AND FACILITIES
Presently the condition of the mill is very poor due to a lack of maintenance and to the location of the facility. It was built on a landslide area. Following the construction, the foundations settled causing misalignment and warping of the furnace and a serious instability of the building itself. The condensing system is completely rusted out. Four small buildings on the property are usable as storage - small office facilities. The Pine Mountain shaft was also sunk in the edge of the slide area and now has a "dogleg" about 45 feet below the collar. The water level is at the 180 foot level in the workings. There is no other equipment on the property that has any value for an operating mine. * * * ORE RESERVES AND POTENTIAL
The only ore reserves at the Pine Mountain Mine are the stone pillars which are impossible to recover and amount to only several hundred tons. These pillars, however, gave us an idea as to the size and tenor of the mined ore shoots. (See assay and plan maps.) Although the three most promising areas were drilled during Dixilynn's exploration *454 program, no new ore was discovered. While this core drilling could have easily missed the ore shoots proper, the close spacing of the hole intersections in bracketing these zones virtually proved the impossibility of the commercial mineralization needed to justify building a new facility at Pine Mountain. Sometime during the period in which Dixilynn was developing and working the mine, i.e., from April 1969 to March 1970, Bacon signed a contract to sell his claims to Mr. Coleman (Coleman) for a price between $ 50,000 and $ 100,000. Coleman, however, decided not to buy the claims and did not execute the contract. L & M's first involvement with the mine was when Dr. Kron visited the mine in December 1972. As of that visit, there had been a cave-in, the foundation of the smelter was cracked, and Dr. Kron could not see any further down the shaft than approximately 40 to 50 feet. On February 5, 1973, Mercer, as agent for L & M, and the Bacons signed a contract which transferred to L & M 80 percent of the Bacons' interest in the mining claims which they owned. The purchase price was $ 2,760,000 of which $ 985,000 was allocated to buildings and $ 1,775,000 was allocated to the claims *455 and mill sights. L & M was to pay the Bacons out of the proceeds from minerals which they recovered and sold and was to waive all rights to proceeds until the full purchase price had been paid. The Bacons also agreed to manage and mine the property for $ 300 per month beginning on October 1, 1973. On May 14, 1973, Mercer and the Bacons signed another document which purported to transfer the same mining claims from the Bacons to L & M. The document modified the terms of the February 5, 1973 contract, and the two operative differences between the contract and the subsequent document were as follows: 1. The document provided that in the event of default, the Bacons were limited in their action to recovery of assets listed in the agreement (contract), and 2. The Bacons agreed that neither L & M Investments, nor any of its partners, would be personally liable for the purchase price. For the taxable years 1972 through 1975, L & M filed U.S. Partnership Income Tax Returns (Forms 1065) which claimed deductions as follows: DEDUCTIONS
1972
1973
1974
1975
Salary & Wages
$ 8,442.49
$ 4,815.00
$ 3,650.00
$ 3,690.00
(other than to partners)
Payments to partners
(salaries & interest)
2,275.00
Rent
1,591.36
1,969.38
2,640.00
2,856.00
Interest
2,033.62
2,226.89
1,982.26
1,953.52
Taxes
1,322.96
619.75
303.74
616.87
Insurance
227.61
2,139.56
Repairs-Casualty
8,100.00
Casualty:
Mine
1,050,000.00
475,000.00
145,000.00
Stinson Airplane
30,000.00
Repairs-Property
7,120.70
Auto & Airplane
Depreciation:
Buildings & Machinery
Mine
82,085.00
75,000.00
60,666.00
House
3,375.00
4,500.00
4,500.00
4,500.00
Furniture/Fixtures
500.00
500.00
500.00
500.00
Motor Home
3,813.00
3,813.00
3,813.00
Airplane
3,750.00
5,000.00
5,000.00
Cadillac
1,500.00
1,500.00
1,500.00
1,500.00
Dodge 72
1,067.00
Mark IV
3,066.00
Loss carried forward
from 1971 returns
7,490.69
Commissions
1,750.00
Other Deductions
41,656.48
14,758.88
12,191.36
14,811.50
TOTAL DEDUCTIONS
$ 80,265.21
$ 1,172,677.46
$ 624,268.06
$ 247.972.89
*456 The "other deductions" on L & M's Forms 1065 for the taxable years 1973, 1974 and 1975 were as follows: EXPLANATION
1973
1974
1975
Other Deductions
$ 14,758.88
Utilities & House Repairs
--    $ 846.06
$ 1,596.35
Insurance
--    2,495.95
3,314.01
License Fee
--    218.35
--
Post Office Box
--    32.40
28.00
Travel & Operating Expenses
--    8,598.60
--
Travel & Entertainment
--    --  2,918.63
Auto Tags & Repairs
--    --  3,078.78
Mining Operations direct
expense
--    --  3,875.73
TOTALS
$ 14,758.88
$ 12,191.36
$ 14,811.50
The casualty loss, which L & M reported on its 1975 Form 1065, was reported as follows: Continued loss due to widening and scope, encompassing most of the underground network subsurface, above ground buildings have sustained additional damage in 1975. During 1973, 1974 and 1975, L & M did not produce or sell any ore from the Pine Mountain Mine During 1973, 1974 and 1975, L & M did not make any payments to the Bacons toward the purchase price of the mine. OPINION Respondent has advanced the *457 following arguments to support his disallowance of L & M's deductions from the Pine Mountain Mercury Mine: 1. L & M's purchase of the Pine Mountain Mercury Mine lacked economic substance; 2. L & M's activities were not engaged in for profit pursuant to section 183; 3. L & M did not sustain casualty losses in 1973, 1974 or 1975 regarding the alleged cave-in of the mining shaft and damage to the buildings; 4. Assuming that L & M sustained casualty losses, petitioners failed to establish the amount of casualty loss deduction to which the partnership is entitled to each year; 5. L & M depreciated personal assets, not assets used in a trade or business; and 6. L & M deducted expenses which were either not incurred by the partnership or were personal, nondeductible expenses of the partners. In Packard v. Commissioner,85 T.C. 397, 417 (1985), we stated: The first prong of the sham inquiry, the business purpose inquiry, is a subjective test and simply concerns the motives of the taxpayer in entering the transaction. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 92; *458 see Knetsch v. United States,364 U.S. 361 (1960). A taxpayer's failure to establish that a transaction was motivated by tax avoidance is not conclusive, however, that the transaction was a sham. Rather, if an objective analysis of the transaction indicates that a reasonable possibility of profit existed apart from tax benefits, the transaction will not be classified as a sham. Frank Lyon Co. v. United States, 435 U.S. at 583-584; Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 203 & n.17. Business Purpose Test (Subjective Test)
Petitioners have presented two business purposes for purchasing the Pine Mountain Mercury Mine and land: 1) to develop and exploit the Pine Mountain Mercury Mine and 2) to develop a recreational area. We, however, find that petitioners had neither of these alleged business purposes. Mercer acquired, on behalf of L & M, an 80-percent interest in the mine, from John Bacon, his uncle. The record does not inform us as to any details of the negotiations. Mercer did testify that he arrived at the purchase price by relying on the Frederick report and the affidavit of two men, Dick Robbins and *459 Jack Rolston. The record, however, contains no evidence which would indicate whether Mercer, an attorney before the Arizona State Bar Association disbarred him after he plead guilty to income tax charges, had any experience in, or knowledge of, the mining industry, or whether he was qualified to interpret the Frederick report and make a valid business decision as to its economic potential. The record also shows that Dick Robbins and Jack Rolston signed affidavits, but there is no indication that they related to the value of the mine. Finally, both L & M and the Bacons would benefit from an inflated purchase price because L & M, as an 80 percent partner, and the Bacons, as a 20 percent partner, would each receive increased deductions. Even if Mercer and the Bacons had negotiated at arm's length, the mine would not have been profitable. L & M purchased the mine in 1973 when mercury sold for an annual average price of only $ 286. Two companies, United Nuclear and Dixilynn, had lost a total of approximately $ 450,000 in previous attempts to develop the mine when mercury's average annual price was approximately $ 500. Furthermore, the mine did not have a workable shaft or proven *460 ore reserves. Without proven ore reserves, Mercer/L & M could not have known whether there was sufficient ore available to cover the cost of sinking a new shaft. Mercer testified that the partnership eventually intended to develop the land as a recreational area. We reject outright this fiction; petitioners presented no marketing surveys, appraisals, blue prints, architect sketches, or any other evidence of a proposed plan. Economic Substance (Objective Test)
A taxpayer's failure to establish that a transaction was motivated by a business purpose rather than by tax avoidance, does not ipso facto establish that the transaction lacked economic substance. If we objectively analyze the transaction and find that a reasonable possibility of profit existed, the transaction will be respected for Federal tax purposes. See Frank Lyon Co. v. United States,435 U.S. 561, 583-584 (1978); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 203 & n.17 (1983), affd. 752 F.2d 89 (4th Cir. 1985). In the present case, we find that the purchase *461 price of $ 2,760,000 was so grossly inflated that L & M could not have made a profit. With respect to the fair market value of the property, which L & M purchased, respondent relied on Robert L. Hamilton (Hamilton), a mining engineer from the Internal Revenue Service. [5] Hamilton has 35 years of experience in the mining industry and his prior responsibilities included assisting in mining control, directing diamond drilling, expansion of ore reserves, exploration, and responsibility for recording all data on maps for mine operators. On April 6, 1984, Hamilton visited the Pine Mountain Mercury Mine. Hamilton's expert report relied primarily on the fact that two corporations investigated and mined the area and, after expending *462 over $ 450,000 in such procedures, abandoned the premises. He concluded that the fair market value of the land was $ 44,000. [6] Hamilton's testimony and report were logical, and we adopt his findings that the mine's value was $ 44,000. Petitioner's expert witness was Harvy W. Smith (Smith), a consulting mining engineer. He has been associated with the mining industry for 20 years and has done other evaluations and appraisals of mines. His report was based upon the Frederick report, various reports which the department of mineral resources had filed, and a reconnaissance of the property, although he could not get into the mine because the addit and shaft were caved in. Smith's report, however, was not addressed at valuing the Pine Mountain Mercury Mine and land; it focused on the estimated cost to rehabilitate the mine to its former condition. Even if the report had estimated the land's value, we would reject it. Smith's report relied on the Frederick report which *463 contained insufficient factual data, i.e., it had an insufficient number of channel samples and corresponding assays, which should be presented on a map base, in order to have a continuity of sampling showing if there is any continuity of mineralization or of ore minerals. Finally, John Bacon attempted in 1969 or 1970 to sell his claims to Coleman for a price between $ 50,000 and $ 100,000. Coleman eventually rejected Bacon's offer. Nothing in the record suggests that the Bacons' claims appreciated, or should have appreciated, in value from 1969 to 1973, the year in which L & M acquired the Pine Mountain Mercury Mine. Petitioners' claim that 80 percent of the mine was worth $ 2,760,000 in 1973 is unjustified. The Pinetop Property
Richard G. Giorza (Giorza) was a branch manager for a bank in Phoenix, Arizona and worked at said bank until May 1972. After he left the bank, Giorza moved to Pinetop, Arizona and contacted Mercer about developing property in the Pinetop area. Giorza and Dersham, a contractor who was working in the Pinetop area, joined L & M in 1972 and each partner had partnership interests as follows: Partner
Percentage
Lindner
40
Mercer
30
Giorza
25
Dersham  5
TOTAL
100
*464 On August 3, 1972, Giorza and his wife (the Giorzas) applied for a construction loan from Western Savings and Loan Association (Western Savings) to build a home on property located in Pine Top, Arizona. On said application, the Giorzas declared, under the penalties of perjury, that they were both employees of L & M investment and that the loan was primarily for personal, family, household or agricultural purposes and not primarily for business or commercial purposes. On August 15, 1972, the Giorzas purchased, in their name and as joint tenants with rights of survivorship, approximately five (5) acres of land in Pine Top, Arizona. The purchase price was $ 20,000, of which the Giorzas paid $ 5,800 as a downpayment. On September 11, 1972, the Giorzas borrowed $ 33,500 from, and executed a construction loan agreement with, Western Savings to build a single family residence on the 5 acres of property which they bought. The loan was secured by the Pine Top, Arizona property, and the Giorzas obligated themselves to repay the construction loan, plus interest to Western Savings in monthly installments of $ 253.04. The Giorzas deposited the proceeds from the Western Savings loan into *465 a bank account which L & M had opened at the First National Bank in Pinetop, Arizona on September 15, 1972. The Giorzas and Charles and Kathryn Dersham (the Dershams) were the only authorized signatories on the First National Account. Between September 29, 1972 and December 31, 1972, Dersham constructed a house on one of the five acres which the Giorzas had bought. The cost of the construction was $ 33,743.12. L & M deducted said amount as a business expense on its 1972 partnership return. In January 1973, the Giorzas moved into the newly constructed residence. Some time during 1973, Dersham and Giorza had a dispute with each other, following which they withdrew from L & M Investments. Upon their withdrawal, the Giorzas kept the Pinetop house and 5 acres of land. On July 3, 1973, the Giorzas sold 4 acres of land from the Pine Top property for $ 22,000 and on August 24, 1974, the Giorzas sold the house, and the remaining one acre of land for $ 50,000. OPINION Respondent contends that the cost of constructing the Pine Top house is not deductible because 1) the expenses were not ordinary and necessary pursuant to section 162 or for the production of income pursuant to section *466 212; 2) the activity was not engaged in for profit pursuant to section 183; and 3) the expenses associated with its construction should be capitalized pursuant to section 263. Petitioner argues the converse of respondent's arguments. Section 162(a) provides that the taxpayer may deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger,480 U.S.    , 107 S.Ct. 980 (1987) (Emphasis added.) Section 212 provides in relevant part that one may deduct all the ordinary and necessary expenses paid or incurred during the taxable year for (1) the production or collection of income, and (2) for the management, conservation, or maintenance of property held for the production of income.
We conclude that L & M did not construct the Pinetop house at all, let alone *467 for the primary purpose of producing income or generating a profit. L & M did not hold title to the property; the Giorzas held the title to the property as joint tenants with rights of survivorship. The Giorzas used their money, including the money which they borrowed from the bank, to finance the construction of their home. On their loan application from the Arizona bank, the Giorzas swore under the penalties of perjury that the loan was for personal, and not for business, purposes. The Giorzas were not partners of L & M prior to the construction of their home, and left L & M soon after their home was constructed. The Giorzas were the only tenants in the house. In summary, the Giorzas bought the land, paid for the construction of the house and lived in the house. L & M's only connection with the Giorzas was an L & M bank account which the Giorzas used to deposit the proceeds of their loan and to pay the bills for the construction of their home. Petitioners allege that their "construction business" was a "profit-making activity because the partnership did the following:" 1) acquired real property; 2) maintained books and records for the construction project; 3) obtained *468 a construction loan from Western Savings and Globe Arizona; 4) opened a bank account at the First National Bank in Pine Top, Arizona; 5) acquired a State of Arizona General Contractor's License; 6) obtained building permits from the City of Pinetop, Arizona; 7) obtained water and electrical utilities in the name of the partnership; 8) filed Federal and State employment tax returns and paid federal and state employment taxes; 9) constructed a three-bedroom home; 10) entered into contracts with subcontractors; 11) two of the partners, Dersham and Giorza, were actively engaged in the construction of the spec home; 12) had soil percolation tests performed on the five-acre parcel. L & M did not acquire the real property or maintain books and records for the project; the Giorzas did. Likewise, L & M did not obtain a construction loan; the Giorzas obtained a construction loan and declared on their loan application that the purpose of the loan was primarily for personal, family, household, or agricultural purposes and was not primarily for business or commercial purposes. The bank account, which L & M opened at the First National Bank in Pinetop, was used only in connection *469 with the house and the Giorzas and Dershams were the only signatories on the account. Petitioners' claims regarding licenses, permits and utilities are supported only by oral testimony and not by any underlying documents or other evidence. We give such claims little, if any, weight. L & M did not construct a three-bedroom home; the Giorzas and Dershams did. The record does not support the claim that L & M entered into contracts with subcontractors. The record does not establish that L & M was actively engaged in constructing the home, and the fact that the general contractor, i.e., Dersham, constructed the home does not establish that L & M was in the construction business. Finally, if L & M was really interested in constructing homes on the land, it would have performed the soil percolation tests before the land was purchased. Miscellaneous Deductions
L & M claimed a depreciation deduction in the amount of $ 3,375 in 1972, and in the amount of $ 4,500 in 1973, 1974 and 1975 for the house located at 6009 East Osborn, Phoenix, Arizona, Mercer's personal residence. L & M also claimed interest and real estate tax deductions with respect to Mercer's personal residence *470 as follows: Amount
Year
Interest
Real Estate Tax
1972
$ 2,033.62
$ 475.28
1973
2,226.89
0  1974
1,982.26
303.74
1975
1,953.52
616.87
L & M claimed a depreciation deduction in the amount of $ 3,813 in each of the years in 1973, 1974 and 1975, for Gertrude Doyel's, Mercer's mother, motor home. L & M claimed a depreciation deduction in 1973 in the amount of $ 3,750, and in 1974 and 1975 in the amounts of $ 5,000 for Walter E. Lindner's airplane. L & M claimed a deduction in each of the years 1972 through 1975 in the amount of $ 1,500 for Mercer's Cadillac and deducted a total of $ 2,800 as payments on the Cadillac. L & M claimed a depreciation deduction in the amount of $ 1,067 in 1974 on a Dodge automobile and a depreciation deduction in the amount of $ 3,066 for a Mark IV automobile. L & M claimed a depreciation deduction in the amount of $ 500 for furniture and fixtures. From 1972 until approximately mid 1973, L & M paid rent for Roberta Kruger, a friend of Mercer's. During 1973, L & M made a downpayment on a home for Roberta Kruger and during the remainder of 1973 through 1975, L & M made Roberta Kruger's mortgage payments. *471 During the years in issue, L & M also paid Roberta Kruger a salary and paid for various personal expenses, including her utilities and phone expense. L & M claimed a casualty loss in the amount of $ 30,000 in 1974 for a Stinson airplane. On its 1972 partnership tax return, L & M claimed a loss carryforward which was carried from Mercer's individual income tax return for 1971. OPINION The burden of proof with respect to the enumerated deductions is upon petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners, however, have failed to present any evidence which might establish the business purpose, that the expenses were ordinary and necessary or that would substantiate the amounts claimed as paid. Accordingly, respondent's determination is sustained. Unreported Income (Paul W. Mercer)
Various book statements reflect several deposits to accounts in the name of Mercer during 1972. The accounts and the total deposits for said accounts were as follows: Account
Deposits
The Valley National Bank Trust
$ 63,370.00
Continental Bank checking account
4,405.00
Arizona Bank checking account
6,482.00
TOTAL
$ 74,257.00
*472 Mercer filed his 1972 Federal income tax return and claimed a filing status of married/filing separately. On said return, he reported gross receipts from his legal practice in the amount of $ 13,362.15. Respondent, in calculating Mercer's correct income, determined that Mercer's total gross receipts were $ 74,257 as reflected by the bank deposits, and then reduced the total gross receipts by $ 16,505 to reflect inter-bank transfers and client settlement payments from trust accounts. Thus, respondent determined that Mercer's business income was $ 57,752 ($ 74,257 - $ 16,505). Respondent next divided Mercer's business income by 2 to reflect the fact that Arizona is a community property state ($ 57,752 divided by 2 = $ 28,876). Finally, respondent subtracted the business income that Mercer reported ($ 28,876 - $ 13,362 = $ 15,514). Accordingly, respondent increased Mercer's taxable income by $ 15,514. The chart below reflects respondent's calculations: Gross receipts deposited in banks Valley National Bank
$ 63,370.00
Arizona Bank
6,482.00
Continental Bank
4,405.00
$ 74,257.0 Gross receipts not deposited
0     Total gross receipts
$ 74,257.00 Less: Interbank transfers
(2,300.00)
Client settlement payments from
trust account
(14,205.00)
Business income as corrected
$ 57,752.00 Arizona is a community property state,
therefore divide $ 57,752.00 by 2
$ 28,876.00 Less business gross income as reported
(13,362.00)
Increase taxable income
$ 15,514.00 *473 OPINION The bank account statements in the record support respondent's calculations as to Mercer's total gross receipts. Petitioner, Mercer, however, has presented no evidence on this issue and has failed to argue this issue on brief. Respondent's determination is sustained. See Welch v. Helvering, supra; Rule 142(a). Unreported Income (Florence Mercer)
Respondent determined a deficiency in Florence Mercer's 1972 Federal income tax because one-half of Mercer's community property income is attributable to her. Florence Mercer has presented no evidence on this issue and has failed to argue this issue on brief. Respondent's determination is sustained. See Rule 142(a). Miscellaneous Deductions (Mercer)
In his notice of deficiency, respondent disallowed deductions for depreciation, rent, salaries, interest, entertainment, and net operating loss net carryover, which Mercer had claimed on his 1972 Federal income tax return. The burden of proof with respect to these issue is on petitioner, Mercer. See Rule 142(a). At trial, Mercer conceded that he was not entitled to the salary expense which he claimed. He, however, presented no evidence with *474 respect to the other deductions, and his only explanation was that his records had been misplaced. Because Mercer has presented no evidence with respect to these issues, respondent's determination is sustained. Welch v. Helvering, supra; Rule 142(a). Addition to Tax Section 6653(a)
Section 6653(a) imposes a 5 percent addition to tax if any part of any underpayment is due to negligence or intentional disregard of rules or regulations. Petitioners have the burden of proving that no part of the underpayment was due to negligence. Rule 142(a). Negligence has been found when gross income was understated or deductions were overstated. See Anders v. Commissioner,68 T.C. 474, 493 (1977) (gross income understated); see Bunnel v. Commissioner,50 T.C. 837, 843 (1968) (deductions overstated). Although a taxpayer may employ someone to prepare his/her return, a taxpayer must assume ultimate responsibility for errors in the return. Magnon v. Commissioner,73 T.C. 980, 1008 (1980). In the present case, the record *475 establishes that the Mercers' understated income and L & M/petitioners deducted numerous personal and/or improper deductions, including the cost of the construction of the Giorzas house, deductions associated with the Pine Mountain Mercury Mine tax shelter, depreciation deductions on Gertrude Doyel's motor home, depreciation deductions on Lindner's airplane, deductions for payments for, and deduction for depreciation of, Mercer's Cadillac, depreciation deductions on the 1972 Dodge and the Mark IV automobiles and payments which were for the benefit of Roberta Kruger. These frivolous deductions establish to our satisfaction that the negligence addition applies for each of these petitioners. Petitioners testimony that they never intentionally disregarded any rules or regulations does not dissuade us, and their argument that they relied upon Mercer as their attorney and managing partner does not vitiate our holding. See Magnon v. Commissioner, supra.
Additions to Tax, Sections 6651(a) and 6654
Respondent determined that Florence Mercer was liable for additions to tax pursuant to sections 6651(a)(1) and 6654. Section 6651(a)(1) imposes and addition to tax *476 unless it is shown that the failure to file a timely return was due to a reasonable cause and not to willful neglect. Section 6654 provides that an addition to tax shall apply in the case of any underpayment of estimated tax by an individual. With respect to each of these issue, petitioner Florence Mercer bears the burden of proof. Welch v. Helvering, supra; Rule 142(a). In the present case, petitioner Florence Mercer has presented no evidence on these issues, and respondent's determination, therefore, is sustained. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Walter E. Lindner, Jr. and Thelma B. Lindner, Richard G. Giorza and Rachelle M. Giorza, Paul W. Mercer and Florence L. Mercer, docket no. 6379-76; William G. Hock and Mildred L. Hock, Robert J. Cooper, Walter E. Lindner, Jr. and Thelma B. Lindner, docket No. 7742-77; Lester E. Kron and Louise Kron, docket No. 12376-77; William G. Hock and Mildred L. Hock, Robert J. Cooper, Walter E. Lindner, Jr. and Thelma B. Lindner, docket No. 6672-78. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended. ↩
3. The record does not explain the discrepancy between the amount reported on the Schedule K-1 and the amount which petitioner(s) reported. ↩
4. We presume that the Bacons exercised the option, although the record does not make this clear. ↩
5. Respondent submitted another expert witness report from W. G. Hooper (Hooper), an Internal Revenue Service engineer. Hooper concluded that the property, that L & M purchased, was worth approximately $ 44,000, i.e., $ 29,000 for the mining claims (29 claims X $ 1,000 per claim) and $ 15,000 for the buildings on the property. Unlike Hamilton, however, Hooper did not testify at trial about his report and the record does not indicate Hooper's credentials. ↩
6. Hamilton concluded that the values, that Hooper's report, see n.5, assigned the assets was reasonable, i.e., $ 29,000 for the mining claims (29 claims X $ 1,000 per claim) and $ 15,000 for the buildings. ↩